Bradley *v.* The State.

# BRADLEY *v.* THE STATE.*

INSTRUCTIONS TO JURY.— *Conflict of.*—An erroneous instruction to the jury in a criminal case cannot be corrected by another instruction which states the law accurately, unless the erroneous instruction be thereby plainly withdrawn from the jury.

SAME.—*Extracts from Books.*—The law which goes to the jury from the court should be given as law, unquestioned by authorities extracted from books.

REASONABLE DOUBT.—A juror in a criminal case ought not to condemn unless the evidence excludes from his mind all reasonable doubt as to the guilt of the accused—that is, unless he be so convinced by the evidence, no matter what the class of the evidence, of the defendant's guilt, that a prudent man would feel safe to act upon that conviction in matters of the highest concern and importance to his own dearest personal interests, under circumstances where there was no compulsion resting upon him to act at all. *Arnold* v. *The State*, 23 Ind. 170, explained.

SAME.—On the trial of an indictment for murder in the first degree, the court instructed the jury, in effect, that if the evidence satisfied them of the guilt of the defendant with such certainty that a prudent man would feel safe in acting upon such conviction in his own important affairs, then, in such case, there would be no reasonable doubt of the defendant's guilt.

*Held*, that this test was too narrow.

INSANITY—The defendant in a criminal case is not required to *prove* his insanity in order to avail himself of that defense, but merely to create a reasonable doubt on this point, whereupon the burden of proving his sanity falls upon the state.

SAME.— *Cognitive and Conative Faculties.*—Insanity is a disease which may impair or totally destroy either the understanding or the will, or both; and in a criminal case all symptoms of such disease and its effect upon these faculties should go to the jury, and they must determine, as a matter of fact, the mental condition of the defendant; and an instruction to them which limits their inquiry to the condition of the power to apprehend by the understanding is erroneous.

SAME.— *Voluntary Drunkenness.—Continued Drunkenness.*—Voluntary drunkenness is no excuse for the commission of a crime, but insanity produced by continued drunkenness is a good defense in a criminal action.

SAME.—*Hereditary.— Evidence.*—Evidence of the insanity of the mother and uncle or other relatives of the defendant in a criminal case must be disregarded, if there be not other evidence tending to show that he was himself insane at the time he did the act charged.

PRESUMPTION.— *Use of Deadly Weapon.*—The intent to murder is not conclusively presumed from the deliberate use of a deadly weapon.

*This opinion was rendered at the beginning of the May Term, 1870.

Bradley *v.* The State.

WITNESS.—*Discredit of by the Court.*—An attempt in an instruction to the jury in a criminal case to cast discredit upon a medical witness because he had attended the trial from a neighboring state to testify in behalf of the defendant with the expectation that his expenses would be paid by the defendant or others for him, the defendant being a stranger to such witness, was disapproved.

APPEAL from the Switzerland Circuit Court.

RAY, J.—Cincinnatus Bradley, the appellant, was indicted for murder in the first degree. He changed the venue from before the judge, on account of alleged bias and prejudice. A judge of another circuit was called by Judge Berkshire to try the cause.

A jury found the defendant guilty of murder in the second degree, and that he be sentenced to the penitentiary during life. Motion for a new trial overruled; motion in arrest of judgment overruled; judgment on the verdict.

The evidence shows that the defendant and the deceased were, on the 20th day of September, 1868, living with their families in different parts of the same house, which was owned by the defendant; that no serious quarrel or ill feeling had ever existed between them; that deceased was sitting in the yard, smoking and reading, while the defendant was engaged in driving hogs out. of the yard, in doing which he became greatly enraged; and, after knocking one of the hogs down with a boulder, and throwing it over the river bank, he went into the house, declaring his intention to get his pistol and shoot the deceased; that he came out with his pistol, and deceased was seen with his stool in his hand, coming toward the house; and that when deceased was from fifteen to thirty steps from the porch, the defendant fired from where he stood on the porch, the ball hitting deceased in the right side of the chest, penetrating the lungs and inflicting a severe and dangerous wound. The deceased fell when the shot was fired. The evidence is conflicting as to whether his lower extremities were paralysed by the wound or not—some witnesses saying that they were, and others that they were not.

After the shot, defendant offered to assist the wife of the

wounded man to carry him into the house, saying that he had shot him, and was sorry for it. But the wife refusing to let him assist, he said he had shot him, and was glad of it.

The defendant and his wife then started with their child to the river, and endeavored to get across, first on the ferry-boat, and, on being refused a passage, then by taking a skiff that was lying on the shore; and after putting his wife and child into it and trying to push off, he was prevented by those present, and said that he had done what he had to the deceased in self-defense; and that he did not want to be arrested on Sunday; and if they would let him go to Kentucky he would return the next day and answer for what he had done. Upon returning to his house, he was arrested, and the pistol—one of Sharpe's patent, four-barrelled pistols—taken from him, three barrels being loaded, one empty, and a bottle of whiskey about half full. After his arrest he made an effort to get away, caught the sheriff by the beard, and struggled with him. When at the magistrate's office he asked the officer who had charge of the pistol for it, for the avowed purpose of getting the barrel from the stock and throwing it away. Afterwards he spoke of being admitted to bail in some small amount, and of his ability to give it; and while in jail he made an offer of eight thousand dollars to the sheriff, if he would not lock him up. This offer was in writing. He employed a physician to attend upon the deceased, and paid five hundred dollars; he employed and broke with several attorneys, to each of whom he agreed to pay not less than five hundred dollars.

In the meantime, the deceased, being wounded severely, was carried first into his own house, where he remained several days; then he was carried to the house of Mr. Jennings, where he again remained some weeks, and seemed to be improving, when he was a second time removed, this time to the house Mrs. Salinda Plew, from which time he grew worse until he died, about ten weeks after he was shot. Before his last removal his appetite was good, his wound closed, his limbs recovered their motion, and he seemed

likely to recover. After his removal he grew worse, acute inflammation of the lungs setting in, resulting in suppuration and finally in death. There was testimony tending to show that his death was caused by this inflammation, and not by the wound; and whether the shot or other causes produced his death, was a question fiercely debated upon the trial.

The shot was inflicted, and the deceased died, in Switzerland county.

If the death should be found to have been caused by the wound inflicted upon the deceased by the defendant with the pistol, then the defense relied upon was, that he was insane at the time the fatal shot was fired, and, consequently, *incapax doli.*

The evidence adduced by defendant upon this point, stated in a very general way, tended to establish the following facts:—

1. That his mother became and was insane for twenty years before her death, being at first wild and maniacal, but as she grew older becoming more quiet, and finally settling into a state approaching *dementia,* in which condition she died. The defendant was about ten years old when she became insane, and was thenceforth, until he was over twenty, in the almost exclusive company of his mother, who in her fondness for him was in the habit of taking him out on the banks of the river and spending whole days building houses for him of sticks.

2. That William Gray, the twin brother of defendant's mother, became insane, and for a long time sought opportunities to destroy his own life, in which, though often prevented by the vigilance of his relatives, he finally succeeded, by shooting himself to death. His insanity is traced to no known cause so far as the evidence discloses.

3. That defendant's sister—half-sister, by his father—was also insane, and when last heard from confined in a lunatic asylum in Connecticut. Her insanity is not well defined,

or rather is not characterized by the witnesses; but it was total and undoubted.

4. That Hugh Manfred, a cousin of defendant, had become insane in consequence of an injury inflicted by a horse tramping upon his head; but he subsequently partially or wholly recovered.

5. That defendant himself, when a mere child, had been seized by some disease in the legs, which confined him for five or six years to his room and bed; and when he partially recovered the use of his limbs, he was seized with a disease of the spine, which resulted in a great and permanent curvature of the spinal column, and confined him to the house and bed until he was nearly or quite sixteen years of age; that his sickness had up to that time precluded all attempts to educate him; and, although upon his recovery so far as to be able to go about his father made great efforts to educate him, his mind was so weak and imbecile as to render them utterly unavailing; that his mind remained that of a mere child until after he was twenty years old; and that being now over thirty, he never has acquired any facility in reading or writing.

The evidence tends to show that for the last seven or eight years, and according to some of the witnesses, for ten, he had been a constant, habitual, and excessive drinker of alcoholic stimulants; and had been, in fact, during the seven or eight years immediately before the shooting, constantly drunk—an habitual drunkard. On this point there is almost no contrariety in the evidence. There is evidence tending to show that the small amount of mind he originally had was by this inveterate habit of drunkenness still further weakened and impaired, until his memory was almost entirely destroyed; one of his attorneys testifying that he could not remember what might occur in relation to his business between them from one consultation to another, although such consultations often occurred within a day or two of each other, and sometimes even on the same day; and that when he would have some one writing a letter for

him, he could not remember what he desired to have written in the letter, after he had begun it. The evidence also showed that, being poor, he had recently before the shooting was done become the heir or legatee of a wealthy relative, and was in consequence raised from poverty to opulence in a day. Succeeding this change in his circumstances, his habit of drunkenness and its injurious effect on his mind seem, according to the testimony of some of the witnesses, to have become, if possible, more deeply marked.

He was, just before and during the trial, examined by at least four physicians, who also heard the evidence touching the insanity of his mother, her brother, defendant's sister, and cousin, as well as that unfolding his own previous life, habits, and condition, all of whom concurred in the opinion, which they delivered as experts, that the facts proved in relation to defendant's mother, uncle, sister, and cousin, tended strongly to prove that insanity was hereditary in the family of the defendant; and that the defendant himself was insane at the time he shot the deceased. They also testified, upon a hypothetical case, involving substantially the facts proved, and of which there was evidence to go to the jury, that the defendant was insane at the moment of the fatal act; and that his appearance in court and at the jail strengthened, rather than weakened, their conclusion as to his insanity.

There was little if any evidence tending to show any cause why the defendant shot Evans. Indeed, so far as the evidence discloses the relations of defendant and deceased, they had always been friendly, and the act went to the jury apparently without a motive.

The State introduced proof tending to show that defendant's mother did not become insane until he was about ten years old; and that the immediate cause of her insanity was the death of two children, who both died at the same time.

VOL. XXXI.—32

The State also introduced evidence of eight or ten, or it may be more, of defendant's acquaintances and neighbors, who testified that up to the time of the shooting they had severally known the defendant for a longer or shorter peri·od, had noticed nothing unusual in his manner or appearance, and that they did not regard him as insane.

We proceed to the consideration of the charges given by the court in relation to insanity, and those that on general principles must be held to apply to and give point to the same.    They are as follows:—

"2. The law presumes all persons to be of sound mind, and in a charge of murder it is not necessary for the State to prove, to make out the offense, that the accused was not insane.    If it is claimed that he was, the defendant must prove the fact in his defense.

"4. The act must be done intentionally; and I instruct you that a sane man is conclusively presumed to intend the natural and probable consequences of his own acts, and the intent to murder is conclusively inferred from the deliberate use of a deadly weapon.

"6. The rule of law is, that if from the evidence in the case the jury have a reasonable doubt as to any material fact going to the defense, or necessary to make the cause, the prisoner is entitled to the benefit of the doubt.    But you cannot go out of the evidence to hunt for doubts; but the doubts, if any exist, must arise out of the evidence in the case.    By a reasonable doubt, in law, is intended this: when the evidence is not sufficient to satisfy the judgment of the truth of a proposition, with such certainty that a prudent man would feel safe in acting upon it in his own important affairs.    And, if the evidence in the case, upon any material point for the State and defense considered, does not satisfy your judgment of the truth of all material propositions in the case, and of the criminal liability of the defendant, with such certainty that a prudent man would feel safe in acting upon said matters in his own important

affairs, then, in such case, there would be a reasonable doubt in the case, within the meaning of the law as to reasonable doubts in criminal cases.

"9. To constitute the defense of insanity so as to excuse the defendant from the punishment imposed by law for the offense charged, it is not sufficient to show a weakness of mind only; but it is necessary to prove such a deprivation of the reasoning and mental powers, at the time of the killing, as shows that the defendant did not know the consequences of his act, and that it was a wrong, and that it was illegal.

"10. If the defendant, at the time he did the act charged, knew what he was doing, and that it was wrong, and a violation of law, then he is liable to punishment for it, like any other person. The law will not weigh or consider the different grades of intellect, but will punish the weak as well as the strong in mind—if there exists sufficient mind to know and understand the nature and consequences of the act.

"11. Whether the defendant knew what he was doing at the time he fired, depends upon all the evidence in the case; and in this connection you may consider any attempt, if proved, to flee from the State soon after the doing of the act.

"12. Voluntary drunkenness is no excuse for the commission of a crime, and cannot be set up as a defense.

"13. Continued drunkenness, producing insanity, may be proved; and if the insanity exist to such an extent that the party's mind cannot will or determine to do the act, or does not know the consequences of his act, and that it is wrong, then, in such a case, he would not be liable. But a mere voluntary drunkenness, no matter how much it may excite the accused or arouse his passions, is no excuse—if he has mind enough to predetermine the act and know its consequences.

"14. The fact, if proved, that the mother and uncle of

the defendant were insane, is no evidence of the insanity of the defendant; and without other proof tending to prove that defendant was insane at the time he did the act, it must be disregarded by the jury.

"15. The law does not presume the son insane because the mother was, nor because other relations were; and from such facts alone you can not find insanity in defendant.

"16. The defendant has been permitted to give evidence of his drinking habits before the homicide; yet the evidence will be of no avail, unless you find him insane at the time of committing the homicide, that is, of firing the fatal shot * * .

"22. If the defendant wilfully and with premeditated malice shot Alexander Evans, as charged in the indictment, and inflicted upon said Evans' person a wound, and if said wound was ultimately the cause of said Evans' death, the defendant is guilty of murder in the first degree—if he was not at the time insane within the rules laid down herein * * .

"25. The opinions of medical witnesses are admissible in evidence for the consideration of the jury. The opinions of such witness are not admitted for the purpose of controlling the judgment of the jury, but to be considered for what they are worth in your opinion, when considered with the other evidence in the case.

"26. If you think from all the evidence in the case that you ought to reject the testimony of the medical witnesses, or any of them, you have the right to do so.

"28. If the evidence satisfies you that any medical witness in the case has voluntarily come from the State of Illinois, to testify in behalf of the defendant, with the expectation that his expenses would be paid by defendant or others for him; and if it further satisfies you that the defendant was a stranger to such witness; you may consider these matters in connection with his evidence upon the stand, and all the other evidence in the case, in determining what credit you will give to his evidence; and if you believe from his manner of testifying, and the matter of his

testimony, and from the evidence in the case, that you ought to disregard his evidence, you have the right to do so.

"29. If you find from the evidence that the defendant was not insane at the time of the shooting, but knew right from wrong, and understood the consequences of the act, and had the capacity to predetermine to do the act, and did inflict the wound with premeditated malice, and wilfully, and intentionally, then he is guilty of murder, no matter whether at a prior time he was sane or insane.

"30. If you find that the defendant was of sound mind for thirty-two years next preceeding the act, and has been of sound mind ever since the commission of the act, you may consider this evidence in determining whether he was sane at the time of the shooting.

"32. Mere weakness of mind, when the party knows right from wrong, and knows and intends the effect of his act, will not excuse a homicide; for the law will not weigh degrees of strength of intellect, but only inquire whether the accused knew right from wrong—whether he was capable of wilfully premeditating and maliciously doing the act.

"33. Questions have been asked medical witnesses calling for their opinions upon a hypothetical case, a state of facts supposed by counsel to exist; and opinions have been given to such questions; but because the facts have been supposed to exist by counsel, it is no evidence they do exist; and you are to find what if any of the supposed facts have been established, and if any one is not proved to your satisfaction, then the opinions upon such as are not proved can have no application to the case, and ought, as to them, to be disregarded.

"34. If, after considering all the evidence on the subject of insanity, and facts and opinions of witnesses not of the medical profession, as well as of that profession, you are satisfied (with the rule as to reasonable doubt as given you) that the defendant was not insane at the time of doing the act charged, then the defense of insanity has failed and cannot avail the defendant."

The following charges were given by the court on its own motion:—

"13. I have already said to you, in charges asked by counsel for the State, that if the defendant committed the act, as charged, and knew what he was doing, and that it was wrong and a violation of law, he is liable under this indictment. While this is the law applicable to the question of sanity generally, it seems that in some cases a broader principle should be applied. The best exposition I can give you upon this subject, perhaps, will be to give you what is said by a standard author. I quote from 1 Bishop Criminal Law:—

'§ 478. Yet the form of the question of insanity for the jury, stated above, is well in cases where it is admitted that the mental disease or imperfection extends only to the intellectual powers, and the party has full control over his own actions. How numerous, comparatively, these cases are, is a matter of science and fact not here to be discussed. But it is both understood in science, and sometimes recognized in the law, though judges are slow to yield on this point, that the mental and physical machine may slip the control of its owner; and so a man may be conscious of what he is doing, and of its criminal character and consequences, while yet he is impelled onward by a power irresistible. In such cases, in the language of Lord DENMAN, "if some controlling disease was in truth the acting power within him, which he could not resist, then he will not be responsible." And the question for the jury, under such a state of the proofs, should be so framed as to comprehend this view.

'§ 479. Let it be remembered, likewise, that this irresistible impulse is not always general, but sometimes has reference to a particular class of actions, as, for example, in "homicidal insanity." "There is," says GIBSON, C. J., "a *moral* or *homicidal* insanity, consisting of an irresistible inclination to kill, or to commit some other particular offense. There may be an unseen ligament pressing on the mind, drawing it to consequences which it sees, but cannot avoid,

and placing it under a coercion which, while its results are clearly perceived, is incapable of resistance. The doctrine which acknowledges this mania is dangerous in its relations, and can be recognized only in the clearest cases. It ought to be shown to have been habitual, or at least to have evinced itself in more than a single instance." Even this doctrine, as thus qualifiedly and guardedly stated, is discarded by many judges, as the reader who consults the various cases cited in this chapter will see. This matter, however, is evidently one of evidence, as mentioned in a note to the last section. If really a person is impelled by an unseen power which he cannot resist, no court and jury who believe this fact will hold him guilty of a crime.'

" 14. If it has been proved that the mother of defendant was insane, and that insanity in the mother raises a strong presumption that it is transmitted to the offspring, yet it rests upon the defendant to prove that he was insane at the time the act was committed. The facts that the mother was insane, that the twin brother of the mother was also insane, and that a cousin was insane, if proved, would not be sufficient of themselves to show insanity in the defendant, but are facts strongly tending to show hereditary insanity in the family, and proper for you to consider with the other testimony in the case, to aid you in determining whether the defendant was insane or not when the act was committed. But if the proof shows that the defendant's mother became insane after his birth, and her insanity was the result of the loss of two children, and was not in any way the result of a hereditary tendency to insanity, then the insanity of the mother is entitled to no consideration, in determining the question of the defendant's sanity or insanity; and so, if the proof shows that the insanity of defendant's cousin, Hugh Manfred, was the result alone of an injury received on the head from the kick of a horse, and not in any way the result of hereditary insanity, in that event Manfred's insanity can throw no light upon the defendant's insanity."

Before entering upon a critical examination of each spe-

cial charge to which an exception was reserved, it may be well to remark that an erroneous instruction cannot be corrected by another instruction which may state the law accurately, unless the erroneous instruction be thereby plainly withdrawn from the jury. The effect of the conflicting instructions can only be to confuse the jury; and as they must follow one or the other, it is impossible to determine whether the influence of the court in such a case has been exerted for good or evil. The defendant is entitled to a plain, accurate, and unquestioned statement of the law from the court. Nothing less than this will satisfy the requirement of the statute. *Clem* v. *The State, ante,* p. 480.

The sixth instruction given at the request of the State is in such language as by necessary inference affirms the proposition, that if the evidence satisfies the jury of the guilt of the defendant, with such certainty that a prudent man would feel safe in acting upon such conviction in his own important affairs, then, in such case, there would be no reasonable doubt of the defendant's guilt.

Mr. STARKIE states it as the law, that "a juror ought not to condemn unless the evidence exclude from his mind all reasonable doubt as to the guilt of the accused, and, as has been well observed, unless he be so convinced by the evidence that he would venture to act upon that conviction in matters of the highest concern and importance to his own interest." Stark. Ev. (Sharswood) 865. This rule is stated in discussing the effect produced on the mind by circumstantial evidence; but it matters nothing by what class of evidence this result is attained. There must be this certainty of conviction before a reasonable doubt can be excluded. And we may add to Mr. STARKIE's definition this qualification, that it must be such a conviction of the truth of the proposition that a prudent man would feel safe to act upon the conviction under circumstances where there was no compulsion resting upon him to act at all. In other words, a prudent man, compelled to do one of two things affecting matters of the utmost moment to himself, might,

and doubtless would, do that thing which a mere preponderance of evidence satisfied him was for the best, and yet such a conviction would fall far short of that required to satisfy the mind of a juror in a criminal case. It must induce such faith in the truth of the facts which the evidence tends to establish that a prudent man might, without distrust, voluntarily act upon their assumed existence, in matters of highest import to himself.

The test stated by the court, that the conviction must be such as would induce one to act in regard to his own "important affairs," is too narrow. It must be such a certainty as would justify to the mind action, not only in matters of importance, but in those of the highest import, involving the dearest interests. Nothing short of this can serve as an example of that moral certainty which should alone authorize a verdict of guilty. Moral certainty, says Mr. Burrill, "is a state of impression produced by facts, in which a reasonable mind feels a sort of coercion or necessity to act in accordance with it; the conclusion presented being one which cannot, morally speaking, be avoided, consistently with adherence to truth." Burrill Cir. Ev. 199.

This certainty alone excludes all reasonable doubts. One may act in important matters without having reached this degree of rest from doubt; and nothing, therefore, short of the highest personal interests involved should be placed before the juror as a test, when upon his action may depend the life of another. The highest interests of the prisoner being involved in the decision, the juror's supposed action on no matter of mere importance to himself will serve as his guide. Nor would it be proper for the juror to apply the test to matters personal to himself which are only important considered in comparison with his other affairs. One may perhaps lead a life so near on the level that nothing of import disturbs the even tenor of his way. The test must be uniform; and though in a special case the conviction of the defendant may only involve a short imprison-

ment or fine, still, as the rule may be also applied to cases involving the life of an accused person, the illustration employed should always refer to the highest interest. In this case, from a reference by the judge who tried the cause to the decision of *Arnold* v. *The State*, 23 Ind. 170, we must suppose that what was there given as a simple illustration of a case where a reasonable doubt would exist has been accepted as a test by which to determine all doubts. The opinion was not intended to be thus understood.

In regard to the second charge, it was plainly erroneous, as it required of the prisoner, if he sought to avail himself of the plea of insanity, that he "must *prove* the fact in his defense." So, also, of the fourteenth charge.

If the evidence introduced by the defendant on this subject created a reasonable doubt in the mind of the jury as to the sanity of the defendant, he should have gone acquit. He was not required to prove his insanity. The legal presumption of sanity simply dispenses with proof on that subject in the first instance on the part of the State. When, however, the defendant's evidence has created a doubt on this point, the burden falls upon the State of proving his sanity. The instruction, indeed, would be erroneous by reason of the error in the sixth charge in regard to the extent of proof required to remove all reasonable doubts.

The ninth charge is objectionable also, for the same reason. It requires the defendant "to prove such a deprivation of the reasoning and mental powers, at the time of the killing, as shows that the defendant did not know the consequences of his act, and that it was a wrong, and that it was illegal." How prove this fact? By a preponderance of evidence? or beyond a reasonable doubt? And again we must turn to the sixth instruction to determine what is such a doubt.

But the instruction is erroneous for another reason. It assumes either that the mind possesses but one faculty, the cognitive, or power to apprehend by the understanding, or that this faculty alone is liable to disease which may

relieve the sufferer from responsibility. Neither hypothesis is true. The scientific world, both of the metaphysical and physiological schools of mental philosophers, have accepted the division of powers announced by Kant—the cognitive, or comprehending power; the feelings, or capacities for pain or pleasure; and the conative, or will power; without which latter there is nothing upon which to rest the doctrine of free agency and moral and legal responsibility to the law for an act done or omitted.

That disease may successfully assail this triune organization is not denied; and that its assaults are limited to the understanding can no longer be contended in the light of experience, which exhibits the victims of a lost will in every insane hospital in the civilized world. Man, under the influence of disease, may know the right, and yet be powerless to resist the wrong. The well known exhibitions of cunning by persons admitted to be insane, in the perpetration of an illegal act, would seem to indicate comprehension of its evil nature and legal consequences, and yet the power of self-control being lost from disease, there can be no legal responsibility. Repeated instances are given where persons subject to temporary paroxysms of insanity have, during a lucid interval and when under apprehension of a renewed attack, besought their friends to restrain them by force, that they might not yield to some uncontrolable impulse to do wrong.

A charge, therefore, which limits the inquiry of the jury to the condition of the cognitive faculty is erroneous, because mental disease may as well involve the will as the understanding. That it does also often extend to the affections is equally well established; and perhaps no peculiarity of the insane is more marked than the unreasonable aversion exhibited by them toward those who in health occupied the citadel of their affections. This species of insanity, which would in law avoid the disposition of a man's property by will, of which repeated instances are given in the books, acts directly upon the will and often assumes com-

plete control over that power; and when this result is reached, moral and legal responsibility are at an end.

In determining the sanity or insanity of a testator, undue influence, prejudice, or a morbid affection which controls his will, are well known tests. That degree of influence, either external or internal, which deprives the testator of his free agency avoids the will. "Hence, anything in the character of the will which renders it contrary to natural affection, or what the civil law writers denominate an undutiful testament, as where children, or others, entitled to the estate, in case of intestacy, are wholly disinherited, or if not wholly deprived of a share, it is given in such unequal portions as to indicate that it is done without any just cause, and wholly dependent upon caprice, or over persuasion, or deception, it must always excite apprehension of undue influence, at the very least." Redf. Wills, 521. "So where the will is unreasonable in its provisions, and inconsistent with the duties of the testator, with reference to his property and family, this will impose upon those claiming under the instrument the necessity of showing that its character is not the offspring of mental defect, obliquity, or perversion." Id. 515.

This is a full recognition of the position, that the power of volition may be so far impaired by disease that it may be under the control of the perverted affections; and in such a case the act of the testator is declared not his voluntary deed. Why should the influence of disease upon this power of the mind be recognized by the courts in civil cases and denied when applied to criminal cases? If in the one case the act be declared involuntary because the will is so prostrated by disease as to render it incapable of following the understanding, why should the law exact a criminal responsibility under the same conditions? No one would insist upon limiting the test in the contest of a will to the question whether the testator knew the act he was doing was right or wrong; and yet under this test, enforced in criminal cases alone, a man might be executed for

a homicide whose testament would be avoided on the ground of his insanity.

The doctrine that insanity may affect not only the understanding, but control also the power of volition, was fairly recognized by Chief Justice SHAW, in the case of *Commonwealth* v. *Rogers*, 7 Met. 500; although an apparent reluctance to be the first to announce a doctrine then regarded as radical has rendered the entire opinion more unsatisfactory and confused than any other pronounced by that learned judge and distinguished jurist. This was again declared by Judge BREWSTER, in *Commonwealth* v. *Haskell*, 4 Am. Law Rev. 240; by Chief Justice PERLEY, in *State* v. *Pike, Id;* and by this court, in the case of *Stevens* v. *The State, ante,* p. 485.

We will not attempt to discuss the different announced classifications of insanity—with them we have nothing to do. Their technical names and nice theoretical distinctions have long enough confused courts and cast contempt upon the verdict of juries. Insanity is a disease. The effect it has produced upon the faculties of the reason and will are all we are concerned with. It is no more the province of a court to instruct a jury as to the effect this disease will produce in a special subject, than as to the result of an attack of cholera or fever. The effect which has been produced is a question of fact, and to be proved in like manner. Insanity must be recognized as a disease which may impair or totally destroy either the understanding or the will, or indeed both; and all symptoms of such disease and its effect upon these faculties should go to the jury, and, as a matter of fact, they must determine the mental condition of the defendant. We are well aware that the doctrine of insanity has been the shield employed by counsel to cover the most execrable crimes, and that juries have disgraced themselves and degraded their office in applying it to the sanest of criminals. In special cases they will not distinguish between insanity and moral depravity. If there ever were a time when the truth might be withheld, the tempt-

ation would be strong upon us now. But there is no such time in the history of courts. It is our duty to declare the law as we understand it, fully and plainly, and any responsibility for its misapplication must rest upon those who abuse a plain truth. We are satisfied that it is always safer that the law should be well understood, than that it should seem clothed in mystery.

Indeed, it must be evident that the cases where the shield of insanity protects the guilty, are those alone where the circumstances attending the act appeal so strongly to the sympathy of the jury that they would acquit without even a pretext; where the feelings control the judgment and the moral obligation of their oath, and fit the triers, if not the tried, for an inquest of insanity.

The tenth, eleventh, twenty-ninth, and thirty-second instructions are objectionable, also, as limiting the question of insanity to the understanding.

The instructions in regard to intoxication are correct in the abstract, and cannot be criticized in the absence of more special instructions presented by the defendant, with the exception of the thirteenth charge, which limits the question of insanity to the understanding. Nor do we see any valid objection to the charge in regard to hereditary insanity.

The thirteenth charge given by the court on its own motion contains an extract from Bishop's Criminal Law, which we will not review, except to remark that the requirement of Gibson, C. J., therein contained, that homicidal mania, to be recognized, must be habitual, would find very few cases where it could be favorably applied. Before the defense could be available, the victim of the mania would doubtless have been confined for life, or executed, in the effort to acquire the habit. The entire sections quoted were not proper for the consideration of a jury. The law that goes to the jury from the court should be given as law, unquestioned by the opinions of other judges.

In regard to the twenty-eighth charge, wherein the court

casts discredit upon a medical witness because he may have attended the trial from an adjoining state with the expecta tion that his expenses would be paid, it must receive our unqualified disapprobation. The motive prompting him may have been, and doubtless was, one in the interest of humanity and science, and merited no implied censure from the court, a *forum* where truth should be sought from all sources.

The twenty-second charge is also objectionable, as resting upon the sixth charge.

The fourth charge contains the same extract from Greenleaf on Evidence that was declared erroneous in the case of *Clem* v. *The State*, *ante*, p. 480.

There is also a point made upon the introduction of evi dence, but as this forms only a reason for the granting of a new trial, and the question may not be again presented, we will not extend this opinion to examine the ruling of the court thereon.

We desire to acknowledge our obligation to counsel for the labor and learning displayed in the preparation of the argument for the appellant.

Judgment reversed, and the cause remanded for a new trial.

ELLIOTT, J., without assenting to all the reasoning in the foregoing opinion, concurs in the decisions on the points ruled.

*J. W. Gordon, W. W. O'Brien, S. Carter, H. A. Downey,* and *J. A. Works,* for appellant.

*D. E. Williamson,* Attorney General, for the State.