## WALL *v.* THE STATE.

CRIMINAL LAW. — *Motion to Require Prosecuting Attorney to Elect Between Counts of Indictment.*—Where, in an indictment of more than one count, the several counts are evidently based on the same alleged felony and inserted to avoid the consequences of a possible variance, it is not error to overrule a motion to require the prosecuting attorney to elect on which count he will try the defendant.

SAME.—*Homicide.—Self-Defence.—Instruction.*—On the trial of an indictment for murder, it is sufficient to establish a case of self-defence, if the defendant, being without fault, believed, and had reasonable ground to believe, from the acts of the deceased, that his own life was in danger, or that he was in danger of great bodily harm ; therefore, on the trial of such an indictment, where the evidence was such as to entitle the defendant to a correct instruction to the jury as to the law on this subject, it was error to charge, that "there can be no successful setting up of the plea of self-defence in a case of homicide, unless the necessity for taking life is *actual, present and urgent;* in a word, unless the taking of his adversary's life is the only reasonable resort of the party who kills his antagonist, and he is compelled to do so in order to save his own life or his person from great harm and severe calamity;" or to charge, that "self-defence can only be resorted to in a case of *absolute necessity.*"

From the Allen Circuit Court.

*J. Q. Stratton* and *R. F. Stratton,* for appellant.

*C. A. Buskirk,* Attorney General, *S. M. Hench,* Prosecuting Attorney, and *W. G. Colerick,* for the State.

DOWNEY, J.—The appellant was indicted for the murder of one Morgan Cronkhite. The indictment is in four counts, each charging murder in the first degree. A motion by the defendant to quash each count of the indictment was overruled. A motion to require the prosecutor to elect on which of the counts of the indictment he would try the defendant, was also overruled.

The defendant, on being arraigned, pleaded not guilty. There was a trial by jury, and a verdict of guilty against the defendant, and that he suffer death. A motion for a new trial was overruled, and sentence was pronounced against the defendant.

The assignments of error bring in question :

1. The refusal of the court to quash the indictment.

2. Overruling the motion to require the prosecutor to elect on which count of the indictment he would try the defendant.

3. Denying the defendant a new trial.

4. Overruling the motion in arrest of judgment.

We agree that there was no error in overruling the motion to quash the counts of the indictment.

There was nothing wrong in refusing to require the prosecuting attorney to elect on which count of the indictment he would put the defendant on trial. The several counts were evidently based on the same alleged felony, and inserted in the indictment to avoid the consequences of a possible variance between the allegations and the proofs. Under such circumstances, the prosecutor is not bound to elect on which count he will try the defendant. *Mershon* v. *The State, ante,* p. 14, and *Griffith* v. *The State,* 36 Ind. 406, and cases cited.

The assignment of error relating to the overruling of the motion for a new trial presents several questions. It was alleged in the motion, that the verdict was contrary to law; that it was contrary to the evidence; that the court misdirected the jury in the instructions given, designating them specially; that the court erred in refusing the defendant the right to examine and challenge certain jurors; and in the admission of certain evidence on the trial, which evidence is particularly mentioned in the motion.

We do not deem it necessary, nor, perhaps, is it advisable as we view the case, that we should express any opinion as to the sufficiency of the evidence to justify the verdict returned by the jury.

We will state the substance of the evidence of the wife of the deceased, who was present at the occurrence, and whose evidence supports the State's theory of the case, and also the evidence of the defendant, in substance, which presents the theory of the case insisted upon by the defendant.

It may be stated generally, that the deceased lived in the second or upper story of a house in Fort Wayne, and that

the defendant lived in the lower story of the same house. The deceased had not lived with his wife for some time until within a few days before his death. He came home in the evening of the day he was killed, and found his wife in conversation with the defendant, at the door of his part of the house, which led into the hall. He and his wife went upstairs.

Ruth Cronkhite, the widow of the deceased, states the facts as follows:

" He, the deceased, then asked me what I was doing downstairs talking to that nigger. I told him Wall wanted me to write him a letter and make a dress for his girl. He said that was all right. He said that if Wall continued to sing and pray to-night as he had done until one or two o'clock, he would be tempted to go down-stairs and kick or put him out of the house, as he was very tired and sleepy. Cronkhite did not say anything more about the defendant. As soon as Cronkhite made the expression about being tempted to put Wall out, Wall came up-stairs. He had a revolver in his right hand, ten or eleven inches long. He was holding the butt in his hand, with the barrel behind him. He said, ' Look here, gentleman, you accuse me wrongfully. I do not sing and pray until one or two o'clock every night.' Deceased was then sitting in a chair. He said, ' I wonder what you call it?' and laughed. I then stepped to one side. Cronkhite then saw Wall have the revolver. He then got up and walked up to Wall, and laid his hand on his arm, and told him to go out of the room. My husband did not strike Wall, and made no threats against him. He only told him to leave the room. I think he called Wall a nigger, but do not remember. I was alarmed. I then went to the cupboard; my back was towards the parties. When I turned round, I saw my husband falling. I then fainted. Just before he fell, I heard a dead sound, like a person striking another over the head a heavy blow. For a while I can't say what occurred. Wall threw a stove-hook, about two feet long, at Cronkhite, who was then lying on the floor.

Then Wall took a piece of pine board and made an effort to strike my husband over the head with it. I requested him not to do so. He looked like he would take the blood of both my husband and myself. I do not know where the revolver was then. I did not see any knife. Wall then went down-stairs. I saw a great deal of blood all over the floor, on the chair my husband sat on, and on the window. I saw two gashes on his head. . He had been stabbed twice in his breast, and one gash down in the lower part of his bowels. His entrails were out of one of the gashes. I got him up and on a chair. He told me to help him to bed. I took hold of him, and he fell on the floor. The Tuesday evening before this, Wall was up-stairs, and sang hymns and prayed at my husband's request. My husband was not drunk. He might have had a glass or two. I do not know whether Wall was drunk or not. My little son was holding my husband's entrails in with a cloth. Wall went for a doctor. I heard a noise like water running out of a bottle uncorked, and then saw the blood on the floor. I assisted my husband to the chair before I sent for the doctor. He said, 'Ma, please help me up; I am killed.' He said Wall had stabbed him; that he was in great pain. He said Wall had struck him over the head with the stove-hook, and with the revolver first."

The following is the case as stated by the defendant in his testimony: "Mr. and Mrs. Cronkhite went up-stairs, then I heard Cronkhite say to her what was she doing down in that d—n nigger's room. She said he wanted her to make a dress for his little girl; and then he said, 'I will go down and kill that d—n nigger.' She said, 'Wall has done nothing to you or to me.' He said, 'He is a pretty d—n nigger, singing and praying all night.' He then said he would go down and cut the G—d d—n nigger's heart out of him. I then heard Cronkhite's footsteps as if he was coming out of the door; then I started up-stairs to see him; just before I went up-stairs I was cutting meat with a knife I used to clean my brush; I have no recollection of what I had in my

Wall *v*. The State.

hand when I went up-stairs, as I was so excited; I met Cronkhite at the head of the stairs; I said, 'Gentlemen—' I started to say, 'Gentlemen, you have accused me wrongfully;' Cronkhite struck at me; I threw up my right arm, and the blow struck me across the back of the hand and back of my head; he struck me with a billet of wood; while I was stooping he caught my head under his arm; he then struck me in the face several peels; I do not know what he struck me with; he then held my head under his arm; he struck me in the breast; I do not know what I did with the knife if I hang; I then tried to get away from him; this was in the hall or landing; I do not know when I went into the kitchen; then I first recollect I pressed him from me; then I struck him after Cronkhite struck me; I struck him with all my might and knocked him clear, and his head struck the window; I then left; my vest was torn off me; at request of Mrs. Cronkhite I went for the doctor; owned a revolver, but did not take it up-stairs with me, had not seen it for several weeks; I do not know where the knife was when I went up-stairs, nor where I left it when I came down stairs; I sang and prayed in the morning only; I had left my wife; she was my second wife, and I had changed my name," etc.; "I did not strike Cronkhite with the poker, knife or pistol; I don't recollect stabbing him when down."

The court instructed the jury at great and unnecessary length; and, among the instructions, the following was given, and to it there was an exception:

"16. If you find from the evidence that the accused refused to leave the room of the deceased when requested, and in consequence of his refusal and threatening attitude, the deceased undertook to remove him, and a scuffle ensued, and the deceased used more force to remove the prisoner than the circumstances required, and that the deceased beat the accused and used much more force and violence in attempting to remove him from the room than was necessary, and the prisoner acted on the defensive; yet the law regards human life as the most sacred of all interests com-

mitted to its care and protection; and there can be no successful setting up of the plea of self-defence in a case of homicide, unless the necessity of taking life is actual, present and urgent; in a word, unless the taking of his adversary's life is the only reasonable resort of the party who kills his antagonist, and he is compelled to do so in order to save his own life or his person from great harm and severe calamity. Nor can the accused often get the benefit of the plea of self-defence, if he sought the deceased with a view to provoke a difficulty or to bring on a quarrel; especially is this the case where death is caused by a sharp cutting instrument or a lethal weapon."

We are of the opinion that this instruction does not state the law of self-defence correctly. It is enough, to make out a case of self-defence, if the defendant, being without fault, believes, and has reasonable ground to believe, from the acts of the deceased, that his life is in danger, or that he is in danger of great bodily harm. *Kingen* v. *The State*, 45 Ind. 518. But in the charge given the court said:

"There can be no successful setting up of the plea of self-defence in a case of homicide, unless the necessity of taking life is actual, present and urgent; in a word, unless the taking of his adversary's life is the only reasonable resort of the party who kills his antagonist, and he is compelled to do so in order to save his own life or his person from great harm and severe calamity."

The difference between danger which a party has reasonable ground to fear, and does fear, and that which is actual, present and urgent, is quite perceptible. It is not for us to say whether a case of self-defence is disclosed by the evidence in this case or not. There was evidence which entitled the defendant to a correct statement of the law on the subject.

The court also gave the following instruction to the jury, to which there was an exception:

"18. If from the evidence you find that, after the accused ascended the stairs, the rencounter commenced at the door of

the room occupied by the deceased, and before the accused entered it, and that in fact it was the deceased, and not the accused, who began the attack, still the law will not excuse the latter in using an unlawful weapon upon the deceased in his own house. Self-defence can only be resorted to in a case of absolute necessity. The right of the accused to defend his person did not arise until he had at least attempted to avoid the necessity of such self-defence. But if you find from the evidence that the accused, at the time of the killing, actually did believe, and had reasonable ground to believe, that the deceased was going to or was likely to kill him, or to do him some great bodily harm, and if the deceased commenced the attack, and the accused only acted on the defensive, and really did believe it was necessary to take the life of his antagonist to save his own, then you should acquit him of murder; but may find him guilty of manslaughter, should the evidence make it plain that it is a case coming within the law of manslaughter as already stated by the court. But in this connection you must bear constantly in mind that the right of attack for the purpose of self-defence does not and cannot arise until the slayer has done everything reasonably in his power to avoid its necessity; that is to say, there must be no other possible, or at least reasonable and probable, means of escaping such necessity, and the necessity must be actual and great, and must arise from imminent peril of death or some great bodily harm."

We think this charge should not have been given. It is probably liable to the same objection as the preceding. The court said, "Self-defence can only be resorted to in a case of absolute necessity." Do not the words "absolute necessity," and the latter part of the charge, exclude the idea that the defendant might defend himself, when, in the language of Bishop, without fault, he reasonably apprehends death or great bodily harm to himself?

But this charge is liable to another objection. The court said in it:

"But if you find from the evidence that the accused, at the

time of the killing, actually did believe, and had reasonable ground to believe, that the deceased was going to or was likely to kill him, or to do him some great bodily harm, and if the deceased commenced the attack, and the accused only acted on the defensive, and really did believe it was necessary to take the life of his antagonist to save his own, then you should acquit him of murder, but may find him guilty of manslaughter, should the evidence make it plain that it is a case coming within the law of manslaughter as already stated by the court."

It is not easily seen why, if a case of self-defence is made out as to murder, it is not also as to manslaughter. As the case did not result in a verdict for manslaughter, this objection to the instruction might not, in the absence of any other error, require us to reverse the judgment.

Other instructions are complained of, but after an examination of them we have failed to find any material objection to them. We do not deem it necessary to set them out in this opinion.

There are other reasons for a new trial which were urged below, and are again presented here, but we do not deem it necessary to examine them.

There was no ground, that we can discover, for the motion in arrest of the judgment.

The judgment is reversed, with costs, and the cause remanded, with instructions to grant a new trial.

BIDDLE, C. J., concurs with the conclusion of the court, but holding that other errors intervene in the record, delivers the following opinion:

Joseph Wall stands indicted, tried, convicted, and under sentence of death for the crime of murder in the first degree. He appeals to this court, and alleges the following errors of record:

1. That the court erred in overruling the appellant's motion to quash each count of the indictment.

2. In overruling the appellant's motion to require the

prosecuting attorney to elect upon which count of the indict-
ment he would try the appellant.

3. In overruling the appellant's motion for a new trial.

4. In overruling the appellant's motion in arrest of judg-
ment.

Other errors are assigned, but they all fall within the third
assignment, as above stated.

It is alleged against the indictment, that it does not suffi-
ciently specify the title of the action. The record shows the
case to be entitled, " *The State of Indiana* v. *Joseph Wall.*—
Murder." This is sufficient. *Wall* v. *The State*, 23 Ind.
150; *Bailey* v. *The State*, 39 Ind. 438; *Willey* v. *The State*,
46 Ind. 363.

The indictment contains four counts. The name of the
deceased, in the first count, is alleged to be *Morgan Cronk-
hite;* in the second, *Morgan Cronk, alias Morgan Cronk-
heit;* in the third, *Morgan Cronkhite, alias Morgan Cronk.*

There is no error in this. The person injured may be
described by name, by one name with an *alias,* or as a per-
son whose name is unknown. 1 Whart. Crim. Law, sec. 250–
260; *The State* v. *Gardiner,* Wright (Ohio), 392; *O'Brien*
v. *The People,* 48 Barb. 274; *Kriel* v. *Commonwealth,* 5 Bush
(Ky.), 362.

The fourth count is substantially the same as the first, only
varying slightly in the means of killing. The indictment
is good.

As to the second assignment, I think the court commit-
ted no error in refusing to compel the prosecuting attorney
to elect upon which count he would proceed to trial. It is
apparent on the face of the indictment, that the felonies
charged in the separate counts are substantially the same.
*McGregor* v. *The State,* 16 Ind. 9; *Mershon* v. *The State,*
*ante,* p. 14; *Griffith* v. *The State,* 36 Ind. 406.

The third alleged error raises several points:

1. The appellant challenged Henry Hackmyer, as a juror,
for cause. Hackmyer, having been put upon his oath, was
questioned as to his competency, and answered as follows:

" I think that the grand jury's having indicted the defend-
ant is some evidence that the defendant is guilty.    I sup-
pose that he is guilty, or the grand jury would not have
indicted him.    The grand jury's returning the indictment,
makes me think he is guilty."

The juror then, further, in reply to questions propounded
to him by the State's attorney, said that he did not understand,
in making his replies to the defendant's counsel, what was
meant by the word "indictment;" that he had always before
heard it called "a bill." He said he was a German, and
was not much acquainted with courts, and supposed the case
had been tried in July last, when the man was killed; but
now that he understood it, that a "bill" only had been
found against the defendant, and the fact that it was only a
"bill," and that he now understood what an indictment
meant, it would not affect his decision in the case; that he
had not formed or expressed any opinion as to the guilt
or innocence of the defendant, nor did he know anything
about the case; that he did not hear any of the evidence at
the coroner's inquest, nor at any preliminary examination,
nor had he read anything about it in the newspapers; that
he had not conversed with any of the witnesses in the case,
nor with any one who knew anything of the matter person-
ally; that he had no prejudice in favor of, nor ill-will or
prejudice against, the defendant; that upon the law and the
evidence he could give the defendant a fair and impartial
trial; that any slight impression he might have formed would
not influence his verdict.

The court overruled the challenge, and I think properly.
The evidence, taken together, does not show a cause of chal-
lenge against the juror.    *Bradford* v. *The State*, 15 Ind. 347;
*Cluck* v. *The State*, 40 Ind. 263; *Rice* v. *The State*, 7 Ind.
332.

Other challenges for cause were made to jurors, and cor-
rectly overruled, upon the principle above laid down and
the authorities cited, and therefore need not be separately
noticed.

2. Ruth Cronkhite was called by the State as a witness, and, over the objection of the appellant, was allowed to testify upon the trial as follows:

" I assisted him" (the deceased) " to the chair, before I sent for the doctor. He said, 'Ma, please help me up; I am killed.' He said that Wall had stabbed him; that he was in great pain; that he did not know as to the number of places he was stabbed. * * * I then assisted him to the chair. Immediately after Wall went down-stairs, I went to my husband's assistance. He made these expressions while I was assisting him. He said that Wall struck him over the head with the revolver, and complained of suffering pain, after he fell down on the floor near the door. He said that Wall had struck him over the head with the stove-hook also. He said he had struck him with the revolver first, and had thrown the stove-hook at him, which had struck him on the head, and glanced off and struck the window. All this was said immediately after the affray, and while I was helping him to the chair."

The objection taken to this testimony was, that it was not a part of the res gestæ, nor was it shown that the deceased " at the time was in extremis," nor that the statement was made by the deceased under the belief that he was in extremis.

The rule of law as to res gestæ is clear and well understood; the difficulty lies in its application to given cases; and herein some latitude must be given to judicial discretion. In this case, the statement of the deceased being so immediately connected with the transaction, and yielding something to the discretion of the judge who conducted the trial, I cannot say that error was committed in admitting the evidence to the jury. Greenl. Ev., sec. 108; Hill v. The Commonwealth, 2 Grat. 594; Crookham v. The State, 5 W. Va. 510; Houston v. Houston, 4 Ind. 139.

3. Objection was also taken to the testimony of John Palanty, which was as follows:

" When I came back to Cronkhite's house the second time, Cronkhite said he would have to die. He said he

wanted me to send a man for the doctor, and wanted me to come back and stay with him. Cronkhite said that Wall came up-stairs with a revolver in his hand, and that he, Wall, said, 'Don't fool me around so long.' Cronkhite told me that he put his hand on Wall's left arm, and said, 'You have no business here.' Cronkhite then said that Wall then struck him on the head with the revolver, and knocked him down. He then said that when he" (Cronkhite) "raised up from the floor, Wall struck him another blow on the head with the poker, and knocked him senseless, and that he did not know what passed after he received this blow. Cronkhite told me that Wall had cut him three or four times with a knife, but he did not know where Wall had taken the knife from. Cronkhite asked me if I understood what he" (Cronkhite) "had said to me. I told him I did. Cronkhite said, 'Perhaps I will be dead before the doctor comes,' and for me to tell the court that Wall had killed him with a revolver, knife and poker, and tell this for him. He wanted me to recollect these facts. Cronkhite told me nearly twenty times that he would die before the doctor would come. Cronkhite looked bad and felt bad; he looked pale, and as if he was almost dead, and was very weak, and could not turn himself. He was then close to the window; his head was between the windows, and his feet towards the sleeping-room."

The ground of the objection to this testimony taken below was, that it did not fairly come within the rule admitting "dying declarations," and the same ground is urged here; but I am of a different opinion. It seems to me clear, that the deceased, at the time he made the statement, was actually in a dying condition, and that he was fully impressed with the fact, and that the evidence is such that, if the deceased were alive, he could properly testify to the same facts. *Binns* v. *The State*, 46 Ind. 311.

4. The first of the instructions given by the court to the jury, which were excepted to by the appellant, is a part of instruction numbered 6, which is in the following words:

"Nor is it my intention by the words 'reasonable doubt' to declare that a bare possibility of innocence will acquit, because that may be true in nearly all cases. What I wish to be understood as saying is this: where a circumstance is of a doubtful character, or doubtful in its bearings, you are to give the accused the benefit of the doubt. If, however, all the facts established necessarily lead the mind to the conclusion that he is guilty, though there be a bare possibility that he is innocent, you should find him guilty."

Many learned judges have endeavored to define a "reasonable doubt," but perhaps it is not susceptible of a clearer definition than that expressed in the plain words "reasonable doubt;" for it is a doubt which is cognizable by the reason, and dwells in the understanding, as distinguished from a doubt which is raised by fear, hope, love, hatred, fancy, feeling, prejudice, interest, or some of the motives which sway our nature, and which flits through the emotions instead of resting in the mind. While the requisite strength of evidence should be required in every criminal prosecution before a conviction should follow, I do not think that a bare possibility of innocence amounts to a reasonable doubt. I cannot therefore pronounce the instruction erroneous. *Findley* v. *The State*, 5 Blackf. 576; *Sumner* v. *The State*, 5 Blackf. 579; *Bradley* v. *The State*, 31 Ind. 492;

5. The appellant excepted to the following portion of instruction No. 10:

"Where one person kills another, it is to be presumed that the killing was purposely done, if the circumstances of the homicide do not, of themselves, show it was not intended, but accidental. Whenever the fatal act is committed deliberately, or purposely and *wilfully*, without adequate provocation, the law raises the further presumption that the slayer was actuated by malice. But this presumption against the accused, arising from the fact of killing, will only hold him guilty of murder in the second degree; and if the State intends to bring the case within the rule that establishes

murder in the first degree, the burthen of proof is on the prosecution to show you by clear, unequivocal and distinct proof, that it was a considered, deliberate and premeditated act."

This part of the instruction is incorrect, and there is nothing in the other parts of the instruction to qualify or correct it. Its plain meaning is, that if the killing was done deliberately, or purposely and wilfully, it amounts to murder in the second degree. This is not the law. A killing may be deliberately done, and be excusable or justifiable; it may be done, purposely and wilfully, and amount to no more than manslaughter at most. Malice is an indispensable ingredient in the killing, to constitute murder either in the first or second degree. The intentional words in the definition of murder in the second degree are *purposely* and *maliciously;* and the crime cannot be committed without both *purpose* and *malice* concur with the act. The word *wilfully* is not the equivalent of the word *maliciously;* and a wilful killing does not necessarily imply a malicious killing. *Miller* v. *The State,* 37 Ind. 432; *Kingen* v. *The State,* 45 Ind. 518; *Field* v. *The State,* 50 Ind. 15.

6. The thirteenth instruction, after properly defining manslaughter, adds the following:

" If the killing is voluntarily or purposely done, it must be under such circumstances as to preclude the inference of malice, the mind being so heated by the raging of anger, and this passion finding such hasty expression in act, as to negative any presumption of malice."

This instruction was excepted to by the appellant, and it is erroneous for the reasons given in considering instruction 10. It means plainly that if the killing be either voluntarily or purposely done, malice is implied, unless it "be under such circumstances as to preclude the inference." See authorities *supra.* Exception was taken to instruction 14, which reads as follows:

" If you find, from the evidence in the case, that Cronkhite, the deceased, and his wife and the prisoner occupied

different parts of the same dwelling, and that the prisoner, in consequence of some unfriendly and insulting remarks, or, as stated by him, some threatening words, made by the deceased and overheard by the prisoner, left his own part of the house and ascended the stairs and came into the part occupied by the deceased and his family, armed with a pistol, knife or other deadly weapon, and some controversy arose between them, that the deceased thereupon requested the prisoner to leave the room and go to the prisoner's own part of the premises, telling him at the same time 'that he had no business where he then was,' and that the prisoner refused to go when so requested, the deceased then had the right to put him out of the room, using no more force than was necessary to effect the object. And if you further believe, from the evidence, that the deceased then went to the prisoner and placed his hand on him and told him he must leave, and if you also believe that the prisoner, by his own conduct, had made this act necessary and proper on the part of the deceased, and that while the deceased was doing a lawful act in a lawful way, that is to say, only removing the prisoner from his room, the prisoner then struck the deceased and knocked him down and beat him with a pistol or stove-hook, and cut and wounded him, the deceased, with a knife or some other unlawful weapon or instrument of a similar character, which beating, wounding and cutting caused the death of Cronkhite as charged in the indictment, you should find the prisoner guilty."

When the court instructed the jury as above, that if the facts stated in the instruction were proved, they should find the prisoner guilty, the proper meaning of the words would be that they should find him guilty as he stands charged in the indictment, unless the degree of the crime of which they should find him guilty was also stated at the time. Upon this view of the case, the instruction is wholly wrong. If all the facts stated in the instruction were proved, the crime would not amount to either degree of murder. The instruction nowhere uses the words *purposely* and *maliciously*, or

even *unlawfully*, as applied to the killing, without which the crime cannot be murder; and, according to the case of *Hittner* v. *The State*, 19 Ind. 48, it would not necessarily amount to manslaughter; for in that case this court held:

"It was not right to say to the jury, without qualification, that if the defendant made an unlawful attack, or got into a fight with the deceased, upon a sudden heat, and slew him in the controversy, he 'would be guilty of manslaughter, at any rate.' The qualification of the charge, which we think should have been made, should have been directed to meet the settled principle of law above quoted, namely, giving the accused, under such circumstances, the benefit of his retreat, flight or withdrawal from the contest, if the jury believe, from the evidence, that such was the fact, although he might have been the aggressor in the first instance."

7. Instruction 16 was given by the court in the following words:

"If you find from the evidence that the accused refused to leave the room of the deceased when requested, and, in consequence of his refusal and threatening attitude, the deceased undertook to remove him, and a scuffle ensued, and the deceased used more force to remove the prisoner than the circumstances required, and that the deceased beat the accused and used much more force and violence in attempting to remove him from the room than was necessary, and the prisoner acted on the defensive; yet the law regards human life as the most sacred of all interests committed to its care and protection; and there can be no successful setting up of the plea of self-defence in a case of homicide, unless the necessity of taking life is actual, present and urgent; in a word, unless the taking of his adversary's life is the only reasonable resort of the party who kills his antagonist, and he is compelled to do so in order to save his own life or his person from great harm and severe calamity. Nor can the accused often get the benefit of the plea of self-defence, if he sought the deceased with a view to provoke a difficulty or to bring on a quarrel; especially is this the case where death is

caused by a sharp, cutting instrument or a lethal weapon."

Exceptions were also reserved to this instruction. It is objectionable for the same reasons given in the case of *Hittner* v. *The State, supra,* and should not have been given. It virtually denies the right of self-defence to a prisoner who was the first aggressor, and cuts off all motive to withdraw from the contest, and thereby return to the protection of the law.

8. The seventeenth instruction was given as follows, and was also excepted to by the appellant:

"A person who intrudes wrongfully into the house of another puts himself in the wrong by refusing to go out of it when requested to do so, and he is bound to submit to as much force from the owner or occupier of the house as is necessary to put him out; and if, while such necessary and reasonable force is being applied to him, he resist and kill the owner or occupier with a deadly weapon, it is murder, and not self-defence. For, in such case, the intruder's right of resistance would not be called into existence at all, unless the owner or occupier used, or was in the act of using, or was manifestly about using, more force than was necessary to put him out; and then he would have the right to resist, but only to the extent, and by the use of means necessary and proper to repel such excessive force so used or impending."

This instruction would make the killing murder, without any regard to whether it was done *purposely* and *maliciously* or not; and it is therefore erroneous. The killing with a deadly weapon is not necessarily the equivalent of a killing *purposely* and *maliciously,* and does not imply that the killing was murder.

9. Instruction 18 was expressed in the following words, and the appellant excepted:

"If, from the evidence, you find that, after the accused ascended the stairs, the rencounter commenced at the door of the room occupied by the deceased, and before the accused entered it, and that, in fact, it was the deceased, and not the accused, who began the attack, still the law will not

excuse the latter in using an unlawful weapon upon the deceased in his own house. Self-defence can only be resorted to in a case of absolute necessity. The right of the accused to defend his person did not arise until he had at least attempted to avoid the necessity of such self-defence. But if you find, from the evidence, that the accused, at the time of the killing, actually did believe, and had reasonable ground to believe, that the deceased was going to or was likely to kill him, or to do him some great bodily harm, and if the deceased commenced the attack, and the accused only acted on the defensive, and really did believe it was necessary to take the life of his antagonist, to save his own, then you should acquit him of murder, but may find him guilty of manslaughter, should the evidence make it plain that it is a case coming within the law of manslaughter, as already stated by the court. But, in this connection, you must bear constantly in mind, that the right of attack for the purpose of self-defence does not and cannot arise until the slayer has done everything reasonably in his power to avoid its necessity; that is to say, there must be no other possible or, at least, reasonable and probable means of escaping such necessity, and the necessity must be actual and great, and must arise from imminent peril of death or some great bodily harm."

This instruction, after stating a case of self-defence and instructing the jury that in such case they should acquit the prisoner of murder, adds, that they may find him guilty of manslaughter. This is erroneous. And the close of the instruction puts the right of defence upon actual and great necessity and imminent peril of death or great bodily harm. The law is otherwise. Where the necessity is clearly apparent, and is such as would convince a reasonable man that it actually existed, and he believed that it did so exist, it is sufficient; as when one antagonist angrily approaches another with a gun presented and cocked, in a menacing attitude, threatening to take his life, it will justify the one assaulted in instantly taking the life of the assailant, although

it might afterwards turn out that the gun was not charged, and that there was no actual danger. *Creek* v. *The State*, 24 Ind. 151; *Meredith* v. *Commonwealth*, 18 B. Mon. 49; *State* v. *Harris*, 1 Jones (N. C.), 190; *Logue* v. *The Commonwealth*, 38 Penn. St. 265; *Maher* v. *The People*, 24 Ill. 241; *Head* v. *The State*, 44 Miss. 731.

It is urged upon us, that when the instructions, taken together, express the law, the judgment will not be reversed, though parts of them, taken separately, might be erroneous. I am of opinion, in this case, that the instructions, taken together, do not state the law correctly. And the most forcible case which the appellee cites to this point (*Eggleston* v. *Castle*, 42 Ind. 531) shows that the court gave an additional instruction, correcting the one apparently wrong

It is also held, in *Kirland* v. *The State*, 43 Ind. 146, that when instructions are inconsistent with one another, and are calculated to confuse or mislead the jury, the judgment should be reversed. Besides, this court has frequently held, in criminal cases, that an erroneous instruction cannot be corrected by another instruction which may state the law correctly, unless the erroneous instruction is thereby withdrawn. *Kingen* v. *The State*, 45 Ind. 518; *Bradley* v. *The State*, 31 Ind. 492; *Somers* v. *Pumphrey*, 24 Ind. 231; *Snell* v. *The State*, 50 Ind. 516; *The Toledo, etc., R. W. Co.* v. *Shuckman*, 50 Ind. 42.

The bill of exceptions states,

" That during the argument of said cause to the jury, Walpole G. Colerick, who made the closing argument on behalf of the State, read to the jury from a newspaper, which he stated was only done as a part of his argument, certain portions of the evidence, purporting to be a portion of the testimony of the witnesses who had testified on the trial of said cause, the same not being reported by a sworn reporter appointed by the court, the court stating to the jury that they should take the evidence from witnesses, and not from newspapers, to the reading of which the said defendant at the time excepted." But we are not informed what the evidence

was, which was so read to the jury, and therefore cannot say that there was any error in the ruling.

A motion in arrest of judgment was made by the appellant, overruled by the court, and exception taken. No ground for this motion has been pointed out to us, and we can find none coming within the statute. 2 G. & H. 424, sec. 144.