STATE, Appellant, v. ESSER, Respondent.*

*December 1, 1961, March 9, 1962—May 4, 25, 1962.*

* Motion for rehearing denied, without costs, on October 2, 1962, WILKIE, J., taking no part.

568

For the appellant the cause was argued by *William A. Platz,* assistant attorney general, and *Donald R. McCallum,* deputy district attorney of Dane county, with whom on the briefs were *John W. Reynolds,* attorney general, and *James H. McDermott,* assistant attorney general, and *William D. Byrne,* district attorney of Dane county.

For the respondent there were briefs by *Lawton & Cates* of Madison, and oral argument by *Richard L. Cates.*

FAIRCHILD, J.  The state requested an instruction defining insanity in terms of a mental condition rendering the defendant incapable of distinguishing between right and

wrong.[2] The language requested was taken from headnotes 18, 19, and 20 of *Oborn v. State*.[3] The state contends here: (1) The right-wrong definition was part of the common law in force in the territory of Wisconsin at the time our constitution was adopted, and the constitution prohibits the courts from changing it. (2) This definition was in any event a common-law rule of criminal law in force here in 1955 when the legislature enacted the Criminal Code,[4] and under sec. 939.10, Stats., it must remain in force and unchanged until modified by the legislature. (3) This definition ought to be adhered to upon its merits even if the court has power to modify it.

---

[2] "The term 'insanity,' in the law, means such an abnormal condition of the mind, from any cause, as to render the afflicted one incapable of distinguishing between right and wrong in the given instance, and so rendering him unconscious of the punishable character of his act. A person is not immune from punishment for a wrongful act if he has, at the time of perpetrating it, capacity to distinguish right from wrong, in respect thereto. If you determine that this defendant was, at the time of the crime here charged, legally sane, then he is responsible for his acts. Therefore, if this defendant, Gregory Esser, was in your opinion capable of distinguishing right from wrong at the time of Jerry Anderson's death, then you must *not* answer the question on the verdict relating to sanity, but must instead proceed to find said defendant either guilty or not guilty of first-degree murder, deliberating thereon in accordance with the other instructions which I have given you in that area.

"With respect to the issue of defendant's sanity, that is his legal sanity, I instruct you further that the law does not recognize any form of insanity wherein there exists a capacity to distinguish right from wrong, even though such insanity might render the afflicted one incapable of refraining from doing that which he recognizes as wrong. He who in the law can distinguish right from wrong must, at his own peril, choose rightly between them. Legal insanity to be a defense to a crime must be such a defect of the mind as to render one incapable of distinguishing right from wrong in the given instance."

[3] (1910), 143 Wis. 249, 126 N. W. 737.

[4] Ch. 696, Laws of 1955, Title XLV, Stats.

We conclude on the first and second points that this court may properly develop or adopt a new definition of the defense of insanity if it deems necessary in the interests of justice and in the light of present-day knowledge. The majority is not convinced, however, that there is need for a fundamentally different rule, and concludes that the courts in this state should define the defense of insanity in terms of inability, caused by mental illness, to understand the nature and quality of the alleged wrongful act or to distinguish right from wrong with respect to such act.

We then reach the question whether upon a review of the record in this case the state is entitled to a new trial because of the circuit court's use of the definition in the draft code of the American Law Institute in its instructions to the jury, and we conclude that the error does not require reversal.

1. *Does the constitution restrict the court's power to develop common law?* Sec. 13, art. XIV of the Wisconsin constitution provides:

"Such parts of the common law as are now in force in the territory of Wisconsin, not inconsistent with this constitution, shall be and continue part of the law of this state until altered or suspended by the legislature."

It is conceded that there is no reported decision of a court in the territory of Wisconsin defining the defense of insanity. The state contends that the right-wrong rule was part of the common law of England before the American Revolution, was therefore in force in the territory of Wisconsin when our constitution was adopted, and therefore cannot be altered or suspended by the courts.

This argument raises several interesting questions of history and legal philosophy.[5] The state's argument assumes that the right-wrong test was a well-developed rule applied

[5] For a description of the process of "reception" of the common law of England in American jurisdictions, see Hall, The Common Law: An Account of its Reception in the United States, 4 Vanderbilt Law Review (1951), 791.

by the courts in England before 1776, and that any rule applied by the English courts as part of a common law of that date must necessarily be a part of the common law of the territory in the absence of some modification by statute or decision of a court having jurisdiction over the area now comprising Wisconsin between 1776 and 1836 when the territory of Wisconsin was created. We are unable to find either such certainty as to the defense of insanity in the law of England in the eighteenth century or such certainty that the reception of the common law of England as developed by 1776 into the territory of Wisconsin was as complete and exact as the state assumes.

*a. Reception of English common law in Wisconsin.* The area now in Wisconsin lay within the Northwest Territory. The Northwest Ordinance of 1787 [6] provided that the inhabitants shall always be entitled to the benefit "of judicial proceedings according to the course of the common law." The governor and judges of the territory were empowered to adopt laws of the original states, and in 1795 they adopted a former Virginia statute declaring in force, "The common law of England, all statutes or acts of the British parliament made in aid of the common law, prior to the fourth year of the reign of King James the First [1607] (and which are of a general nature, not local to that kingdom) . . ." [7] The validity of this adoption of the former Virginia statute is open to question.[8]

In 1810 the governor and judges of the territory of Michigan enacted a law providing that the acts of the parliament of England and the parliament of Great Britain, the

---

[6] United States Rev. Stats. (1878, 2d ed.), pp. 13, 15, 1 W. S. A., p. 736.

[7] Laws of the Northwest Territory (1796), pp. 175, 176.

[8] See *Doe v. Gibson* (1826), 1 & 2 Ohio Rep. 439, decided by an equally divided court; 1 Stats. of Ohio and of the Northwestern Territory (1833), edited by Salmon P. Chase (later chief justice of the United States), note at page 190.

custom of Paris or ancient French common law, the laws and acts of the authorities of Canada, and the laws adopted in the Northwest Territory and the territory of Indiana shall be of no force within the territory of Michigan.[9]

In 1818 the area now in Wisconsin, which had earlier been a part of the territory of Indiana and then of the territory of Illinois, was attached to the territory of Michigan and made subject to its laws.[10] In 1836 the territory of Wisconsin was created and the laws of the territory of Michigan continued in force.[11] In 1839 the legislature of the territory of Wisconsin repealed the acts of the territory of Michigan except that such repeal was not to revive other acts, and provided that none of the statutes of Great Britain shall be considered the law of the territory.[12]

In 1864, sixteen years after the adoption of our constitution, this court concluded "that when our territorial legislature and the framers of our constitution recognized the existence here of the common law, they must be held to have had reference to that law as it existed, modified and amended by English statutes passed prior to the Revolution." [13] The opinion makes no reference to the legislative history which we have outlined except that a quotation from an Iowa decision includes a statement that the Ordinance of 1787 made common law the law of the Northwest Territory. Principally the *Coburn* decision was based upon the proposition that the existence of common law had been assumed from the beginning of the territory and that a void in the legal system

[9] 1 Territorial Laws of Michigan, pp. 210, 900.

[10] 3 U. S. Stat., ch. LXVII, pp. 428–431, 1 W. S. A., p. 750.

[11] 5 U. S. Stat., ch. LIV, pp. 10–16, 1 W. S. A., p. 754.

[12] The Statutes of the Territory of Wisconsin (1839), p. 404, secs. 1, 2, and p. 407, sec. 8. See also *Webster v. Morris* (1886), 66 Wis. 366, 376, footnote 1, 28 N. W. 353.

[13] *Coburn v. Harvey* (1864), 18 Wis. 156 (*147), 162 (*153).

would otherwise exist. Decisions similarly based were cited from Michigan [14] and Iowa.[15, 16]

It is clear that there were some English common-law rules which did not become parts of the common law in American jurisdictions. Courts have generally decided that particular English rules were not to be applied locally if deemed unsuitable to local conditions or out of harmony with local institutions.[17]

If, however, *Coburn v. Harvey* [18] (and that decision was but sixteen years after the adoption of our constitution) stands for the proposition that a rule of English common law developed and applied by the English courts prior to 1776 is to be deemed to have been in force in the territory of Wisconsin, in the absence of statutory change or determination of unsuitability to the territory, we are unable to find that the right-wrong definition of the defense of insanity had reached that stage of development in England by that year.

*b. Defense of insanity in England prior to 1776.* The statement of Chief Justice TINDAL to the House of Lords, usually referred to as the M'Naghten rule, was made in 1843.[19]

---

[14] *Lorman v. Benson* (1860), 8 Mich. 18.

[15] *O'Ferrall v. Simplot* (1857), 4 Iowa 381, 399.

[16] See for discussion of the source of Wisconsin common law, 1 Powell, Real Property (1949), p. 241, sec. 73, and Page, Statutes in Derogation of Common Law: The Canon as an Analytical Tool, 1956 Wisconsin Law Review, 78, 79–89.

[17] Hall, *op. cit., supra,* footnote 5, pp. 805–807; *Coburn v. Harvey, supra,* footnote 13, 160 (*151); *McCall v. Chamberlain* (1861), 13 Wis. 713 (*637), 717 (*640); *Dodge v. Williams* (1879), 46 Wis. 70, 93, 1 N. W. 92, 50 N. W. 1103; *Huber v. Merkel* (1903), 117 Wis. 355, 365, 94 N. W. 354; *State ex rel. Rodd v. Verage* (1922), 177 Wis. 295, 322, 187 N. W. 830.

[18] *Supra,* footnote 13.

[19] The material portion of the statement is as follows:

"And as these two questions appear to us to be more conveniently answered together, we have to submit our opinion to be, that the

Undoubtedly the views expressed had been widely held and applied by the judges before that year, but it does not follow that they had been crystallized sixty-seven years earlier. The state cites 1 William Hawkins, A Treatise of the Pleas of the Crown, p. 1, first published in the period 1716 to 1721. While the author makes reference to "those who are under a natural disability of distinguishing between good and evil" as not being punishable, he also says, "The guilt of offending against any law whatsoever, necessarily supposing a wilful disobedience, can never justly be imputed

jurors ought to be told in all cases that every man is to be presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary be proved to their satisfaction; and that to establish a defense on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong. The mode of putting the latter part of the question to the jury on these occasions has generally been, whether the accused at the time of doing the act knew the difference between right and wrong: which mode, though rarely, if ever, leading to any mistake with the jury, is not, as we conceive, so accurate when put generally and in the abstract, as when put with reference to the party's knowledge of right and wrong in respect to the very act with which he is charged. If the question were to be put as to the knowledge of the accused solely and exclusively with reference to the law of the land, it might tend to confound the jury, by inducing them to believe that an actual knowledge of the law of the land was essential in order to lead to a conviction; whereas the law is administered upon the principle that every one must be taken conclusively to know it, without proof that he does know it. If the accused was conscious that the act was one which he ought not to do, and if that act was at the same time contrary to the law of the land, he is punishable; and the usual course, therefore, has been to leave the question to the jury, whether the party accused had a sufficient degree of reason to know that he was doing an act that was wrong: and this course we think is correct, accompanied with such observations and explanations as the circumstances of each particular case may require." *M'Naghten's Case* (1843), 10 Clark & F., *200, *210, *211, 8 Eng. Reprint 718.

to those who are either incapable of understanding it, or of conforming themselves to it." The latter sentence suggests a broader concept than the right-wrong definition. The report of *Arnold's Case* [20] shows that the court charged the jury that, "If he was under the visitation of God, and could not distinguish between good and evil, and did not know what he did, though he committed the greatest offense, yet he could not be guilty of any offense against any law whatsoever" and further, that the jury was to consider whether the condition of the defendant "doth shew a man, who knew what he was doing, and was able to distinguish whether he was doing good or evil, and understood what he did."

Dalton, The Country Justice, published in 1746, ch. 147, p. 334, states that, "If one that is Non compos mentis, or an ideot, kill a Man, this is no Felony, for they have not Knowledge of Good and Evil, nor can have a felonious Intent, nor a Will or Mind to do Harm; . . ."

In *Earl Ferrers' Case* [21] it is stated:

"My lords, the question therefore must be asked: Is the noble prisoner at the bar to be acquitted from the guilt of murder, on account of insanity? It is not pretended to be a constant general insanity. Was he under the power of it, at the time of the offense committed? Could he, did he, at that time, distinguish between good and evil?"

Notwithstanding the suggestions of the right-wrong test contained in the above quotations, Professor Holdsworth [22] indicates that although insanity was well established as a defense by the seventeenth century, the question of the quality or degree of insanity which would exempt the defendant from criminal liability was not settled until 1800 or later.

---

[20] (1724), 16 Howell's State Trials, 695.
[21] (1760), 19 Howell's State Trials, 886, 947.
[22] 8 Holdsworth's History of English Law (1926), 439, 440.

"No part of the criminal law is so fluid as this, largely because it is a question partly belonging to legal and partly to medical science; and because the latter science has, as medical knowledge advances or the fashion in medical theory changes, adopted very variable views on this matter. . . .

" 'At one time a view prevailed that no lunatic ought to escape punishment unless he were so totally deprived of understanding and memory as to be as ignorant of what he was doing as a wild beast. But, ever since the epoch-making speech of Erskine in defense of Hadfield (in the year 1800), a view at once more rational and humane has prevailed, which bases the test upon the presence or absence of the faculty of distinguishing right from wrong.' Later, a still more-precise test was evolved. Did the accused know the nature of the act which he was doing, and, if he did know it, did he know it was wrong? If so, and if the act was contrary to law, he is punishable."

Sir James Stephen,[23] writing in 1883, appears to have thought that notwithstanding the M'Naghten answers, mental disease might still be a defense if it prevented the accused from controlling his own conduct, unless the absence of the power of control has been produced by his own default. He wrote:

"I cannot help feeling however, and I know that some of the most distinguished judges on the bench have been of the same opinion, that the authority of the answers is questionable, and it appears to me that when carefully considered they leave untouched the most-difficult questions connected with the subject, and lay down propositions liable to be misunderstood, though they might, and I think ought to, be construed in a way which would dispose satisfactorily of all cases whatever."

c. *Cognate common-law definitions of insanity*. Six states have common-law antecedents similar to those of Wisconsin, their areas at some time having been within either the Northwest Territory or the territory of Wisconsin. Ex-

[23] 2 Stephen, Criminal Law of England (1883), ch. 19, pp. 149, 154.

cept, apparently, for Minnesota, the courts of each of them at some period in the nineteenth century followed a definition of insanity broader than the right-wrong definition.[24]

d. *Early Wisconsin decisions on defense of insanity.* *Oborn v. State* [25] upon which the state relies, and in which this court unequivocally approved the right-wrong element of the definition of insanity and excluded from the definition a mental condition which impairs will power but does not render the accused unable to know the wrongfulness of his act, was decided in 1910. It is apparent from the discussion there of earlier Wisconsin cases that circuit courts in this state had at times instructed juries that the defense of insanity "may exist if, though the person be fully conscious of the wrong and its punishable character, he, because of a perverted mind, is moved by an uncontrollable impulse." [26]

In a case in 1899 [27] a defendant challenged a portion of the instructions which defined insanity in terms of incapacity to distinguish between right and wrong, claiming that the defense may also consist of loss of will so that the conduct is beyond the defendant's control. This court pointed out that the circuit court had instructed the jury that the loss by disease of either the cognitive or the conative power was sufficient to constitute the defense. It was said, therefore, to be unnecessary to pass on the question whether the right-wrong definition could properly stand alone.

These cases make it seem improbable that the right-wrong definition as an exclusive test had been a well-recognized rule since territorial days.

---

[24] *State v. Thompson* (1834), Wright's Ohio Rep. 617, 622; *Clark v. State* (1843), 12 Ohio 483, 494, cited in *Yankulov v. Bushong* (1945), 80 Ohio App. 497, 77 N. E. (2d) 88, 91; *Hopps v. State* (1863), 31 Ill. 385, 391; *State v. Felter* (1868), 25 Iowa 67, 83, 84; *People v. Finley* (1878), 38 Mich. 482, 483, 484; *Bradley v. State* (1869), 31 Ind. 492.

[25] *Supra,* footnote 3.

[26] *Supra,* footnote 3, p. 269.

[27] *Butler v. State* (1899), 102 Wis. 364, 366, 78 N. W. 590.

*e. Significance of sec. 13, art. XIV, Wis. Const.* Quite aside from the difficulty of determining the definition of the defense of insanity as developed in English courts before 1776, or in the territory of Wisconsin by 1848, is the more-fundamental question whether sec. 13, art. XIV, Wis. Const., prohibited judicial development of rules or principles as part of the common law in the light of advances in knowledge and newly emerging conditions of society.

Art. XIV is the last article of the constitution and is entitled "Schedule." Most of its fifteen sections deal with problems which would arise in the course of adoption of the constitution and transition from a territory, under an organized government, to a state in which it would be necessary to organize a new government under the constitution. Several of the sections, such as those providing for holding over by certain officers, procedure for ratification, and original legislative districts, were of obviously temporary significance. The function of a schedule is to provide for the transition from one form of government to another until there can be an adjustment to the working of the new constitution.[28]

". . . the general rule is that a provision in the schedule inconsistent with one embodied in the constitution itself must yield to the latter . . ."[29]

Sec. 2, art. VII, Wis. Const., provides in part:

"The judicial power of this state, both as to matters of law and equity, shall be vested in a supreme court, circuit courts, courts of probate, and in justices of the peace . . ."

[28] Black, Interpretation of Laws (2d ed.), p. 43, sec. 22; *Arie v. State* (1909), 23 Okla. 166, 100 Pac. 23; *State ex rel. Attorney General v. Taylor* (1864), 15 Ohio St. 137, 142; *State ex rel. Aquamsi Land Co. v. Hostetter* (1934), 336 Mo. 391, 400, 79 S. W. (2d) 463, 467; *Commonwealth v. Harrison* (1943), 54 Pa. (Dauph.) 395; see *State ex rel. Dunning v. Giles* (1849), 2 Pin. 166, 169.

[29] *State ex rel. Aquamsi Land Co. v. Hostetter, supra,* footnote 28, p. 401.

Just as common-law principles and rules have been recognized or developed in part through the judicial process, so the further adaptation and development of them must be part of the judicial power. The court may modify the common law, adopting such of its principles as are applicable and rejecting such others as are inapplicable.[30] As stated many years ago by Mr. Justice CARDOZO:[31]

"But I am ready to concede that the rule of adherence to precedent, though it ought not to be abandoned, ought to be in some degree relaxed. I think that when a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment. We have had to do this sometimes in the field of constitutional law. Perhaps we should do so oftener in fields of private law where considerations of social utility are not so aggressive and insistent. There should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have determined the conduct of the litigants, and particularly when in its origin it was the product of institutions or conditions which have gained a new significance or development with the progress of the years. In such circumstances, the words of WHEELER, J., in *Dwy v. Connecticut Co.* 89 Conn. 74, 99, express the tone and temper in which problems should be met: 'That court best serves the law which recognizes that the rules of law which grew up in a remote generation may, in the fullness of experience, be found to serve another generation badly, and which discards the old rule when it finds that another rule of law represents what should be according to the established and settled judgment of society, and no considerable property rights have become vested in reliance upon the old rule. It is thus great writers upon the common law have discovered the source and method of its growth, and in its growth found its health and life. It is not and it should not be stationary. Change of this

[30] 11 Am. Jur., Common Law, p. 162, sec. 7.
[31] The Nature of the Judicial Process, Adherence to Precedent, pp. 142, 150–152.

character should not be left to the legislature.' If judges have woefully misinterpreted the *mores* of their day, or if the *mores* of their day are no longer those of ours, they ought not to tie, in helpless submission, the hands of their successors."

"The common law is not a codification of exact or inflexible rules for human conduct, for the redress of injuries, or for protection against wrongs; on the contrary, it is the embodiment of broad and comprehensive unwritten principles, inspired by natural reason and an innate sense of justice, and adopted by common consent for the regulation and government of the affairs of men. Its development has been determined by the social needs of the community which it serves. In other words, the common law is the legal embodiment of practical sense. It is a comprehensive enumeration of principles sufficiently elastic to meet the social development of the people. Its guiding star has always been the rule of right and wrong, and in this country its principles demonstrate that there is in fact, as well as in theory, a remedy for all wrongs. The capacity of common law for growth and adaptation to new conditions is one of its most-admirable features. It is constantly expanding and developing in keeping with advancing civilization and the new conditions and progress of society and adapting itself to the gradual change of trade, commerce, arts, inventions, and the needs of the country. Whenever an old rule is found unsuited to present conditions or unsound, it should be set aside and a rule declared which is in harmony with those conditions and meets the demands of justice."[32]

If sec. 13, art. XIV, Wis. Const., be construed as prohibiting modification of common-law rules by the courts, it would be a limitation by a schedule provision of the grant of judicial power not so limited in the body of the constitution.

Several courts have construed statutory and constitutional provisions adopting English common law as adopting the principles from which the rules and decisions of the English

---

[32] 11 Am. Jur., Common Law, p. 154, sec. 2.

courts arose but not necessarily the rules and decisions themselves.[33]

Although a number of decisions of this court have relied upon sec. 13, art. XIV, Wis. Const., as a reason for applying a particular doctrine of the common law [34] and have thus exemplified the doctrine that established common-law rules will be followed unless after thorough consideration the court is convinced that new circumstances and needs of our society require a change,[35] these decisions do not commit this court to retention of every common-law rule developed before 1776 or 1848.

We recently said:

"In any event, we cannot adopt the view that sec. 13, art. XIV of our constitution prohibited this court from now

[33] *Ketelsen v. Stilz* (1916), 184 Ind. 702, 111 N. E. 423; *Hanriot v. Sherwood* (1884), 82 Va. 1, 15; *People v. Randolph* (1855), 2 Parker's Cr. Rep. (N. Y.) 174, 177.

[34] *Coburn v. Harvey, supra,* footnote 13; *Huber v. Merkel, supra,* footnote 17; *State ex rel. Mueller v. Thompson* (1912), 149 Wis. 488, 493, 137 N. W. 20; *In re Ernst* (1923), 179 Wis. 646, 650, 192 N. W. 65; *Allen v. State* (1924), 183 Wis. 323, 331, 197 N. W. 808; *McCoy v. Kenosha County* (1928), 195 Wis. 273, 277, 218 N. W. 348 (sec. 13, art. XIV, Wis. Const., considered in determining scope of sec. 9, art. I); *Schwanke v. Garlt* (1935), 219 Wis. 367, 371, 263 N. W. 176 (dictum that if there had been a territorial common-law rule on this subject the court would have been bound by it); *Estate of Budd* (1960), 11 Wis. (2d) 248, 258, 105 N. W. (2d) 358.

[35] Recently this court has declined to apply *stare decisis* in several cases, *e.g., Haumschild v. Continental Casualty Co.* (1959), 7 Wis. (2d) 130, 95 N. W. (2d) 814; *Powers v. Allstate Ins. Co.* (1960), 10 Wis. (2d) 78, 102 N. W. (2d) 393; *Kojis v. Doctors Hospital* (1961), 12 Wis. (2d) 367, 107 N. W. (2d) 131, 107 N. W. (2d) 292; *McConville v. State Farm Mut. Automobile Ins. Co.* (1962), 15 Wis. (2d) 374, 113 N. W. (2d) 14; *Colson v. Rule* (1962), 15 Wis. (2d) 387, 113 N. W. (2d) 21; and *Bielski v. Schulze,* ante, p. 1, 114 N. W. (2d) 105. The writer expresses individual regret that *Schwenkhoff v. Farmers Mut. Automobile Ins. Co.* (1959), 6 Wis. (2d) 44, 93 N. W. (2d) 867 (reaffirming parental immunity), is not in this list.

adopting common-law principles or of changing them. Inherent in the common law is a dynamic principle which allows it to grow and to tailor itself to meet changing needs within the doctrine of *stare decisis,* which, if correctly understood, was not static and did not forever prevent the courts from reversing themselves or from applying principles of common law to new situations as the need arose." [36]

We conclude that the function of sec. 13, art. XIV, Wis. Const., was to provide for the continuity of the common law into the legal system of the state; expressly made subject to legislative change (in as drastic degree within the proper scope of legislative power as the legislature might see fit) but impliedly subject, because of the historical course of the development of the common law, to the process of continuing evolution under the judicial power.

*2. Statutory power of the court to develop rule of insanity.* Sec. 939.10, Stats., provides:

"Common-law crimes are abolished. The common-law rules of criminal law not in conflict with the Criminal Code are preserved."

The state contends, in effect, that the quoted section incorporates the *Oborn* rule into the code as if expressly set forth. The 1953 draft of the Criminal Code would have done so. Proposed sec. 339.41, Stats., provided:

"Mental disease or mental deficiency is a defense only if such condition renders the actor incapable of distinguishing between right and wrong in regard to the alleged criminal act at the time the act is committed."

This provision was deleted from the 1955 draft of the Criminal Code, subsequently enacted by the legislature, because of dissatisfaction with the right-wrong test among the drafters.[37]

---

[36] *Bielski v. Schulze, supra,* footnote 35, p. 11.
[37] See Platz, 1956 Wisconsin Law Review, 350, 367, 368.

Comparing the word "preserved" with "abolished" it appears that it was used in order to make it clear that existing common-law rules were not abolished, although common-law crimes were.

As stated by one author,[38]

"If we value this process of growth as highly as I have urged that we ought, then we should always be reluctant to conclude that the legislature, in relation to any matter, has tried to paralyze the process. We should welcome a doctrine which says that the legislature can do this, if it can do it all, not by silence but only by unmistakable words. Only by adherence to such a doctrine can the resources of the judicial process for the infusion of reason into the law be fully utilized."

The drafters of the code might have said that common-law rules not in conflict with the code are to be applied without change. We do not interpret the words used as having the same meaning.

3. *What definition of the defense of insanity should be given the jury?* When a mentally ill person engages in offensive conduct made punishable by law, society is faced with the question whether at the time of engaging in the offensive conduct the accused was dominated or affected by the mental illness to so substantial a degree that society cannot, in good conscience, hold him responsible for the conduct as a crime, *i.e.,* punish him. The legislature and the judiciary, by making general rules, and the jury by its verdict in a specific case must, in combination, provide the answer. The legislature might, but has not, set a standard degree of relationship between the mental illness and the offensive conduct, so that where a relationship of that degree or closer is found by a

---

[38] Hart, The Courts and Law Making—Comment, Legal Institutions Today and Tomorrow, Centennial Volume, Columbia Law School (1959), 47, 48.

jury, the accused is held irresponsible, but where a more-distant relationship is found, he is not. On the other hand, the legislature and courts might avowedly place the entire burden on the jury (where, by reason of the nonreviewability of jury determinations of fact, it really rests anyway). Under the latter method, the jury would decide this ultimate question in each case: Whether defendant's mental illness dominated or affected his conduct to so great an extent that it would be unjust to punish him. Putting this question to the jury is substantially the preferred recommendation of the British Royal Commission on Capital Punishment: [39] "To leave the jury to determine whether at the time of the act the accused was suffering from disease of the mind (or mental deficiency) to such a degree that he ought not to be held responsible."

Almost universally, however, the courts provide a standard by which the jury is instructed to measure whether the degree of relationship between the mental illness of the accused and his offensive conduct is sufficient to relieve him from responsibility. We refer to this standard as the definition of the defense of insanity. It is not a definition of mental illness or medical insanity, but a definition of the defense, a legal and not a medical concept.

There are three types of competing definitions: (1) M'Naghten, or right-wrong, stated in terms of loss of capacity to know the nature and quality of one's acts or to know right from wrong, or distinguish between them. It is immaterial whether there has also been loss of power to control one's conduct. It is assumed that one does not really lose power of self-control unless one has also lost power to know the nature and quality of one's acts or to distinguish between right and wrong. (2) Definitions under which inability to know the nature and quality of one's acts or to distinguish between right and wrong constitutes a

---

[39] (1949–1953), p. 116, par. 333.

defense, but loss of power of self-control, even if standing alone is also a defense. The so-called irresistible-impulse modification of M'Naghten falls in this class, as does also the proposed American Law Institute definition. The latter requires an impairment of one capacity or the other, but not total loss of either.[40] (3) The Durham [41] or New Hampshire [42] definition. "An accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect." This definition comes close to leaving the ultimate question to the jury and, in a sense, is not a standard.

---

[40] The American Law Institute, Model Penal Code, Proposed Final Draft No. 1 (1961), p. 4, sec. 4.01:

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.

"(2) As used in this article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

The instruction given by Judge WILKIE was adopted from these paragraphs, using "criminality" rather than "wrongfulness." He added a paragraph adapted from the concurring opinion of Mr. Justice HALLOWS in *Kwosek v. State* (1960), 8 Wis. (2d) 640, 654, 100 N. W. (2d) 339, as follows:

"One who has the power in a given situation to choose between the doing or the not doing of an unlawful act and freely chooses to do the unlawful act must be held criminally responsible in our society. And, conversely, if such person did not have such volitional capacity because of its total or substantial destruction or of its inability to function freely in a given situation, and such incapacity was caused by and was the result of a mental disease or defect, such person is not criminally responsible for such act and is legally insane. However, in cases where the normal functioning of the will is affected temporarily because of the overpowering influence of passion or emotion which the person might have and ought to have controlled, such person is criminally responsible."

[41] *Durham v. United States* (D. C. Cir. 1954), 214 Fed. (2d) 862.

[42] *State v. Pike* (1869), 49 N. H. 399.

Before discussing the merits of the competing definitions, we deem it advisable to note several of the rules which supply some of the context in which the defense of insanity operates in this state. We think these are of some importance in considering the respective definitions.

One of these matters is the burden of proof on the special issue of insanity.

In England, the defendant has the burden of proving insanity. Under the original statement of the M'Naghten rule, the elements of the defense "must be clearly proved." [43] The extent of the burden has been relaxed so that it is not "higher than that which rests on a party in civil proceedings." [44]

The defendant has the burden of proof on the issue in almost half the states of the United States.[45] In about the same number of states, including Wisconsin, the District of Columbia, and the courts of the United States, the burden is on the prosecution to establish responsibility beyond a reasonable doubt. In Wisconsin this burden is imposed on the state if there is evidence which raises a reasonable doubt of defendant's sanity. In the early drafts of the Model Penal Code [46] an alternative proposal would have placed the burden on the defendant, but this was eliminated at the 1955 meeting of the Institute.

Our statute provides: [47]

"(1) . . . if the jury finds that the defendant was insane or feebleminded or that there is reasonable doubt of his

---

[43] *Supra,* footnote 19.

[44] *Supra,* footnote 39, p. 81, par. 230.

[45] See American Law Institute, Model Penal Code, Tentative Drafts 1, 2, 3, and 4, Comments, p. 193; Weihofen, Mental Disorder as a Criminal Defense (1954), p. 212. Recently . Alaska adhered to this rule. *Chase v. State* (Alaska 1962), 369 Pac. (2d) 997.

[46] *Supra,* footnote 39, p. 6, sec. 4.03.

[47] Sec. 957.11 (1), (2). Stats.

sanity or mental responsibility at the time of the commission
of the alleged crime, they shall find the defendant not guilty
because insane or feebleminded.

"(2) The presumption of the defendant's sanity and
mental normality at the time he committed the alleged crime
shall prevail on the trial of the special issue unless the evi-
dence creates in the minds of the jury reasonable doubt of
his sanity or mental responsibility at said time."

Thus the jury need not be satisfied that the elements re-
quired by the definition of the defense are present in fact.
A defendant succeeds if he is able to raise a reasonable doubt
that they may be present. This seems to the majority of the
court to be an important consideration in deciding whether to
adopt a more-liberal definition than M'Naghten. We are not
at all certain of the relevant scientific truths or principles.
If a defendant had the burden of proving that his mental
illness rendered his conduct virtually involuntary, notwith-
standing his full understanding of the nature, quality, and
wrongfulness of his acts, then, if successful, he might justly
be found insane and irresponsible. But because there is so
much room for doubt in the nature of the matter, we are not
inclined to deem it just to acquit him because he succeeds
merely in raising a reasonable doubt of his capacity to con-
trol his acts. Conversely, in any case where a defendant is
able to convince a jury that his mental illness totally or
substantially deprives him of power to control his conduct,
it seems very probable that such showing will generate in
the minds of the jurors a reasonable doubt of his capacity
to understand the nature and quality of his acts or to dis-
tinguish right from wrong.[48]  And under our law, the jury

[48] "The personality is seen as a fusion of functions and not a
mere interrelation of separate faculties, . . . hence, there can be no
serious impairment of one of these functions without serious im-
pairment of the others." Hall, Psychiatry and Criminal Responsi-
bility, 65 Yale Law Journal (1956), 761, 775.

is instructed to return a verdict of insanity if it entertains such reasonable doubt.

It seems to the majority of this court that a much-more-persuasive argument could be made for liberalizing the definition of the defense of insanity in a state where the defendant has the ultimate burden of proof on this issue.

A second consideration arises from the consequences of conviction. The defense of insanity is most frequently discussed in connection with murder cases, and apparently is most frequently interposed in such cases. Wisconsin does not have a death penalty for any crime, and one who is sentenced to life imprisonment becomes eligible for parole in a fraction more than eleven years. Although these facts would not justify maintaining a particular definition of insanity if scientifically unsupportable, they doubtless color our evaluation of the perplexing problems somewhat differently from that in a jurisdiction where a miscarriage of justice may result in death of the accused.

A third consideration is the need for care and treatment of the mentally ill. One object of our statutes is that one accused or convicted of crime who needs hospital care because of mental illness should have it as long as he needs it and until it is safe for society to have him restored to freedom. If found not guilty because insane, he is committed to a hospital. He is not to be discharged unless the court, in addition to finding him sane, also finds that he is not likely to have a recurrence of insanity as will result in acts which but for insanity would be crimes.[49]

On the other hand one who has been convicted and imprisoned, and then found mentally ill, may be transferred by the department of public welfare to a state hospital, and

---

[49] Sec. 957.11 (4), Stats.

when his prison term is about to expire, a court may commit him to the hospital thereafter if his mental illness continues.[50]

Males are cared for in central state hospital. We are informed that of the total number of patients on March 31, 1961, (346), 39 percent were committed due to inability to stand trial, 2.6 percent by reason of acquittal on a plea of insanity, 17.9 percent by transfer from prison, and 9.9 percent by commitment after expiration of sentence. We do not know how many of the 27.8 percent who reached the hospital via conviction and subsequent transfer from the prison were convicted after a plea of insanity, nor how many of them might have been found not guilty because insane if a different definition of insanity had prevailed. Whatever the fact in that respect, the figures do show that a substantial number of prisoners are hospitalized for mental illness. A study of these cases would reveal whether there was a real question in any substantial number of cases whether it was just to hold the individuals responsible for their offenses, and might be quite persuasive in deciding whether a broader definition of the defense of insanity ought to be adopted.

It should be noted that the legislature has adopted a policy with respect to treatment for persons convicted of sex crimes.[51] These include rape and other specified sex crimes and any other crime except homicide or attempted homicide if the court finds that the defendant was probably directly motivated by a desire for sexual excitement in the commission of the crime. The department of public welfare examines the defendant after conviction. If it recommends treatment for mental or physical aberrations, the court must either place him on probation, conditioned on his receiving treatment, or commit him to the department, which may,

[50] Sec. 51.21 (3), Stats.
[51] Sec. 959.15, Stats.

under certain circumstances, retain control indefinitely. This enactment suggests a legislative policy that persons with this type of mental aberration are to be held responsible, and convicted, but that corrective treatment is to be provided.

We have gained the impression that a large measure of the criticism directed at the M'Naghten definition stems from psychiatrists who do not feel able, conscientiously, to testify in terms of destruction or impairment of capacity to distinguish right from wrong. "To modern psychiatrists, intellection is only one aspect of the mental process, inextricably interwoven with others to make up the whole personality." [52]

There is considerable pressure on the psychiatrist to testify in terms of right-wrong because under the M'Naghten definition that is the ultimate question, and if a psychiatrist does so when he does not consider such testimony within legitimate scientific bounds, he is actually expressing an opinion as to whether the accused *ought* to be held responsible, basically the ultimate question to be resolved in terms of general policy by the legislature and the courts and in respect to the particular case, by the jury.

Dr. Manfred S. Guttmacher, chief medical officer of the supreme bench of Baltimore, calling attention to this problem, has stated:

"It seems to me that all that should be expected of the psychiatrist is the following:

"1. A statement as to whether the defendant is suffering from a definite and generally recognized mental disorder and why and how this conclusion was reached.

"2. If it has been asserted that the defendant suffered from a mental disorder, its name and its chief characteristics and symptoms, with particular emphasis on its effect on an individual's judgment, social behavior, and self-control, should be given.

"3. There should then follow a statement of the way and degree in which the malady has affected the particular de-

[52] Weihofen, *op. cit.*, footnote 45, p. 66.

fendant's behavior, especially in regard to his judgment, social behavior, and self-control.

"4. He should then be asked whether the alleged criminal act was, in his opinion, a product of the mental disorder." [53]

We agree that the psychiatrist should not be required to go further than as described in points 1, 2, and 3 just quoted. Point 4, it seems to us, is really a part of point 3. We do not say that a qualified expert should not be permitted to state his opinion of the effect of defendant's mental illness on his capacity to distinguish right from wrong.[54] But neither should his opinion nor the observations on which he bases it, be excluded as of no probative value if he says he is unable to state it in terms of the accepted definition.

In *State v. Carlson* [55] we said:

"Even under the right-wrong test, no evidence should be excluded which reasonably tends to show the mental condition of the defendant at the time of the offense."

We reaffirm that statement. We are of the opinion that the jury will be best able to perform its function in dealing with this perplexing question if it is given all the information that qualified experts are able to give, even if such information does not fit nicely into the definition which the law has codified. For we are much impressed by the probability that no general standard can be devised that will satisfactorily fit all cases.

"Although the M'Naghten rules are phrased in terms of cognition, they are generally interpreted broadly by the courts, with the result that all psychiatric evidence relevant to the defendant's mental condition is admitted." [56]

[53] The American Law Institute, Model Penal Code, Tentative Drafts Nos. 1, 2, 3, and 4, Appendix B, p. 178, sec. 4.01.

[54] Weihofen, *op. cit.*, footnote 45, p. 286.

[55] (1958), 5 Wis. (2d) 595, 607, 93 N. W. (2d) 354.

[56] Hall, *supra*, footnote 48, p. 774.

In a very recent case the supreme court of Alaska, in adhering to the M'Naghten definition, stressed the importance of liberality in receiving expert testimony as follows:

"We believe that it will work satisfactorily in practice, particularly where the expert witnesses are given wide latitude in describing their findings in their own terms; where the jury is given, so far as relevant and the rules of evidence will allow, the picture of the whole man." [57]

We do not attempt to thread our way through all the criticisms directed at the several definitions of the defense of insanity. Some of the points which we have considered in making an evaluation are as follows:

M'Naghten: If strictly and literally applied (particularly if stated solely in terms of right-wrong, as in *Oborn*) some defendants would probably be convicted although their moral responsibility for their offensive conduct might be doubtful. It has been said that, " 'The M'Naghten rules work broad justice because we stretch them, and have postsentence prerogative means of modifying their application. . . . It is when . . . the rules are rigidly applied (as they frequently are to homicides with sexual motivations) that their narrowness stands revealed.' " [58]

On the other hand the M'Naghten definition tends to reduce the probability that individuals with certain types of mental illness or abnormality will be found insane. "Neuroses have been termed 'part reactions,' because they do not involve a change in the whole personality, as do the psychoses. Nor is reality changed; the world appears to the neurotic essentially as it does to others." [59] The vague term "psychopath" is used, roughly "to refer to groups of mentally

---

[57] *Chase v. State, supra,* footnote 45, p. 1002.

[58] Morris, Insanity and Responsibility, 13 Modern Law Review (1950), 372, 376, quoted in Weihofen, *op. cit.,* footnote 45, pp. 67, 68.

[59] Weihofen, *op. cit.,* footnote 45, p. 17.

abnormal individuals who do not fit into the categories of neurosis, psychosis, or intellectual deficiency. . . . Anomalies in their character, emotions, moral sense, or sexual make-up render them incapable of conforming to social standards or of making satisfactory social adjustments. They are largely unable to put themselves in the other person's position and assess the situation from that standpoint. They must have immediate gratification of wants even at the expense of long-term advantages." [60] Persons so afflicted are less likely to be found insane under the M'Naghten definition and more likely to be so found under the American Law Institute or Durham definitions. Although psychiatrists maintain that many of these people are unable to conform to society's demands and ought to be treated as irresponsible,[61] it seems probable that many individuals who are afflicted with exaggerated, sometimes warped, urges, may well be deterred from unlawful self-gratification by fear of detection and punishment. Society has an interest in prevention of crime which is served by such deterrence. The preference of courts for the M'Naghten definition is doubtless motivated by the thought that it best serves this interest.

From a pragmatic point of view, this court has had no recent experience to indicate that the use of the M'Naghten definition is resulting in injustice. Very few appeals involving the defense of insanity have been here in the last twenty years. We have reviewed the briefs and appendices in five cases [62] during that period which have come to our attention. None of them contains a persuasive showing by

[60] Weihofen, *op. cit.*, footnote 45, p. 22.
[61] Guttmacher, The Psychiatric Approach to Crime and Correction, 23 Law and Contemporary Problems (1958), 633, 639.
[62] *Simecek v. State* (1943), 243 Wis. 439, 10 N. W. (2d) 161; *Wilson v. State* (1956), 273 Wis. 522, 78 N. W. (2d) 917; *Zenou v. State* (1958), 4 Wis. (2d) 655, 91 N. W. (2d) 208; *State v. Carlson* (1958), 5 Wis. (2d) 595, 93 N. W. (2d) 354; *Kwosek v. State* (1960), 8 Wis. (2d) 640, 100 N. W. (2d) 339.

any standard that the defendant ought not to have been held responsible for his conduct.

The American Law Institute definition is less rigorous than M'Naghten, both because it permits a finding of insanity upon an additional ground, and because it requires a lack of *substantial* capacity and does not imply that a total lack of capacity is required. Yet it is subject to some of the same criticism from the point of view of the psychiatrist as M'Naghten because it retains the idea that insanity is to be tested in terms of specified subdivisions or faculties of personality. It may well, literally applied, permit a finding of insanity in cases where moral responsibility would be doubtful, but where M'Naghten literally applied, would not. It seems to us that it would, however, tend to permit a finding of insanity in more of the cases of exaggerated and unresisted urges, and thus tend to impair society's interest in the deterrent effect of punishment.

The Durham definition approaches the concept that if one's offensive conduct is a manifestation or symptom of a mental illness, he should be cared for in a hospital, rather than being subjected to punishment in any form. Where any degree of relationship between mental illness and offensive conduct is discerned, any social interest in the deterrent effect of punishment is subordinated.

The Royal Commission recommendation has great appeal as an intellectual proposition because it does not commit the court to any of the debated theories, but permits a determination of each case by the jury upon consideration of the facts before it, using its own judgment of what is fair and just. But if it does not trammel the jury's exercise of its function as the conscience of the community, by imposing an imperfect generalization upon it, neither does it give the jury any standard. The great majority of courts have considered it unwise to leave the jury without such guidance.

The *Oborn* [63] statement of the M'Naghten definition virtually if not wholly eliminated the portion which permitted a finding of insanity if the accused is rendered incapable of understanding (knowing) the nature and quality of his act. As will be explained later, we are of the opinion that this element should be restored to the definition. Four members of the court, Mr. Chief Justice BROADFOOT, Mr. Justice BROWN, Mr. Justice GORDON, and the writer of this opinion deem that the M'Naghten definition, with the element just mentioned restored to it, should be used in Wisconsin. The writer, however, expresses the individual view that he would favor one of the more-liberal definitions if the burden of proof were on the defendant rather than on the state.

Three members of the court, Mr. Justice CURRIE, Mr. Justice HALLOWS, and Mr. Justice DIETERICH would approve the instruction given by Judge WILKIE, based on the American Law Institute definition. [64]

As heretofore stated [65] the M'Naghten definition in one portion of the original statement was put as follows:

". . . at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong."

Courts have apparently considered that the requirement that defendant, to be excused, must be incapable of knowing the nature and quality of the act does not add anything to the requirement that he must be incapable of knowing right from wrong as to the act charged. [66] This court so assumed in

---

[63] *Supra,* footnote 3.

[64] See concurring opinion, *Kwosek v. State, supra,* footnote 1.

[65] Footnote 19.

[66] Weihofen, *op. cit.,* footnote 45, p. 73.

*Oborn v. State* [67] and stated in *Jessner v. State* [68] that "the two phrases express exactly the same thing, but in different language." The supreme court of Alaska has recently held that it was not error to state the two phrases in the conjunctive. [69]

In a sense it may be true that one cannot know that his act is right or wrong unless he can also know what the act is. If so, it would follow that it would be superfluous to specify that one must be able to know the nature and quality of his act in order to be found sane in addition to stating that he must be able to distinguish between right and wrong with respect to it.

We think, however, that including the former element (nature and quality) gives important emphasis to one element of the realization of the wrongfulness of an act. Suppose that one vaguely realizes that particular conduct is forbidden, but lacks real insight into the conduct. He may be furtive about such conduct, but not really be able to make a normal moral judgment about it. Our study of the record in this case leads us to believe that this proposition is important. Although defendant Esser realized very soon after the fatal shot, first that it would be advisable to hide the victim's body, and later that he should report his act to the police, even referring to it as "murder," yet the expert testimony tends to create a reasonable doubt that he could appreciate and evaluate his act at the time he did it. Although Esser's conduct after the shooting suggests a knowledge that his acts had been wrong and therefore that he could distinguish right from wrong, the expert testimony describing his mental illness tends to show that at the time of the killing he did not understand the nature and quality of his acts and there-

[67] *Supra,* footnote 3.
[68] (1930), 202 Wis. 184, 196, 231 N. W. 634.
[69] *Chase v. State, supra,* footnote 45.

fore could not distinguish right from wrong with respect to them.

We therefore approve the following definition of insanity for use by Wisconsin courts:

"The term 'insanity' in the law means such an abnormal condition of the mind, from any cause, as to render the defendant incapable of understanding the nature and quality of the alleged wrongful act, or incapable of distinguishing between right and wrong with respect to such act."

The courts are not to instruct the jury as stated in *Oborn,* that the law does not recognize any form of insanity where there exists a capacity to distinguish right from wrong even though such insanity might render the afflicted one incapable of refraining from doing that which he recognizes as wrong. It seems to us that it is not wise, in view of the doubts in this perplexing field, to emphasize this negative proposition.

4. *No reversible error under the facts of this case.* Sec. 274.37, Stats., provides, in part:

"No judgment shall be reversed . . . on the ground of misdirection of the jury, . . . unless in the opinion of the court . . . after an examination of the entire action, . . . it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse . . . the judgment . . ."

This court has said:

"Errors committed in the course of a trial will not operate to disturb a judgment on appeal unless it appears pretty clearly that had they not occurred, the result might probably have been more favorable to the party complaining." [70]

We have examined the record before us in order to determine, if possible, the likelihood that the jury, if it had been

---

[70] *Holtz v. Fogarty* (1955), 270 Wis. 647, 650, 72 N. W. (2d) 411.

instructed in the form now approved, would still have held a reasonable doubt of Esser's sanity.

Esser did not testify. Our knowledge of the event comes from the physical facts and the statements Esser made to the officers.

There was a bullet wound in Jerry's back. The bullet had passed through his chest. There was another wound where a bullet had entered over the right temporal region and had gone through the skull and brain. Dr. Angevine, the pathologist, considered that the wound in the head was the most-probable cause of death; that the wound in the back would not have been immediately fatal, and that Jerry could have survived that wound with adequate medical attention; that the bullet in the back was the first one fired. There were three wounds in the upper chest made by a cutting instrument.

It appears that the evidence might give support to one of three general theories of what happened.

(1) Esser told the officers that he and Jerry went out in the woods to hunt with Esser's .22-caliber rifle. While Esser was carrying the gun and Jerry was walking ahead, the gun went off accidentally. Jerry fell from the wound in his back. Esser got scared and shot Jerry in the head. He dragged the body into the brush, thinking he might be able to get away, smoked a cigarette, decided his plan would not work out and sought the officer in order to report the killing. Near the close of his transcribed statement before an assistant district attorney, Esser said he knew that the shot in the temple would be fatal and that he fired that shot in order to kill Jerry and conceal the accident. Esser was not asked about the cuts in Jerry's chest and he volunteered no explanation.

This hunting-accident-followed-by-murder explanation seems improbable.

(2) One officer testified that Esser told him upon questioning at the scene of the killing that Esser had made immoral proposals to. Jerry or had attempted some immoral act, and that Jerry had said he was going to tell his mother. Esser said this in answer to a question whether an unnatural sex act or proposal was possibly the cause of the killing. The officer had, however, made no reference to this conversation in his notes or report and did not recall having told any other officer about it. Although he was present when Esser's transcribed statement was taken no question was asked of Esser about this subject.

If one accepted the version supported by this testimony, one would conclude that both shots were deliberate for the understandable purpose of avoiding disclosure of improper advances made. If the jury believed the officer's testimony, it seems improbable that it would have found Esser not guilty because insane. It does not readily appear that this matter would be affected one way or the other by the difference between the instruction given and the one which we now approve.

(3) A third possible analysis is that the two shots and perhaps the wounds on the chest all resulted from Esser's mental illness as diagnosed and described in the testimony of the experts. That testimony apparently was accepted by the jury, at least to the extent of raising a reasonable doubt of Esser's sanity. It then becomes important to consider the expert testimony in determining whether the verdict might probably have been different if the court had used the presently approved definition of insanity rather than the American Law Institute definition.

It was apparently the theory of the state that Esser was not insane at the time of the killing. He became insane as a result of the experience and recovered his sanity by the time

he was returned from central state hospital for trial, almost four years after the killing.

The state called Dr. Schubert, superintendent of central state hospital. He testified that in November, 1956, the diagnosis of Esser's illness was "schizophrenic reaction, chronic undifferentiated type." He said that in general, the term "schizophrenia" or "schizophrenic reaction" ". . . is applied to an individual who has lost the ability to relate satisfactorily to his fellowmen. He has developed a world of his own in which he exists." He testified that there are subclassifications of schizophrenia and that the term "undifferentiated" is used where the patient does not fit into the symptoms of any of the well-defined subclassifications.

Dr. Schubert testified in response to a hypothetical question based on facts in the Esser case that in his opinion an individual could become mentally ill as the result of the experience of killing another under such circumstances. In response to another hypothetical question, he said it was his opinion that the individual did not have a mental defect or disorder to such a degree that he could not appreciate criminality of his act, and it was his opinion that the individual could have conformed his behavior to what was expected of him. Although it was felt in August, 1960, that Esser met the test of sanity sufficiently to stand trial, he was still considered a dangerous individual.

The defense produced evidence of Esser's background and early experiences. Among other facts, it appeared that when Esser was sixteen or seventeen and in high school, he was brought to the attention of a clinical psychologist on the staff of the Madison public schools. The psychologist considered him withdrawn and thought he might have profited by psychotherapy.

There was evidence that when Esser was thirteen or fourteen, a boy companion was alone with him at the Esser home. They were looking at magazines and there was no disagree-

ment between them. The visiting boy was suddenly struck on the head with a hammer, presumably by Esser.

From 1950 to 1953, Esser served in the navy. In October, 1953, he was working with another seaman, had a sudden urge to strike him on the back of the head with a heavy wrench, and did so. A board of medical inquiry diagnosed him as a schizoid personality, found him unfit for service, and recommended discharge.

There was expert testimony before the circuit court that certain tests in early 1961 indicated organic brain disease. A specimen of Esser's cerebral spinal fluid was obtained by spinal tap. The pressure of the fluid was above normal and the protein level was well above normal. A doctor testified that the latter condition is usually indicative of some abnormal process, disease process, damage, or some abnormal organic condition in the brain or spinal cord. A pneumoencephalogram, and X ray revealing the outline of the chambers of the brain after substituting air for spinal fluid, was taken. The doctor testified that the X ray revealed an atrophy of the left side of the brain; that the type of disease he described impairs the patient's ability to distinguish reality and his ability to evaluate and control his behavior. Upon the basis of the results of a spinal tap made at central state hospital November 30, 1956, it was this doctor's opinion that the disease existed at that date and was then of more than three months' duration. An electroencephalogram (recording of electrical activity of the brain) showed a small amount of abnormality in the left temporal area and to a less extent in the right temporal area. The doctor who testified as to this test considered the result obtained insufficient for diagnosis and significant only in conjunction with other evidence.

Dr. Leigh Roberts, a psychiatrist at the University Hospitals in Madison, teacher of psychiatry at the University Medical School, and psychiatric consultant at Mendota state hospital, was called by the defense. He had interviewed

Esser on a number of occasions, in December, 1960, and January, 1961, and was aware of the tests to which we have referred. It was his opinion that Esser has an organic brain disease which would impair his ability to see reality and to test reality, and would impair his ability to control his behavior; that the disease existed at the time of the tests in November, 1956, and that it was chronic at that time. He gave the same diagnosis as Dr. Schubert, the state's expert, "schizophrenic reaction, chronic undifferentiated type." It was his opinion that Esser was not able to appreciate the criminality of his conduct when he shot and stabbed Jerry Anderson October 28, 1956. An important portion of the doctor's testimony follows:

"*Q*. Why do you in this case, what is the reason for diagnosing Gregory Esser to have been schizophrenic reaction, chronic undifferentiated type on October 28, 1956? *A*. I would consider at least four major categories of symptoms under the diagnosis of a schizophrenic reaction. One of these would be the ability to conform to reality, the ability to see reality, to test reality. A second major group of symptoms would fall under disturbed thinking. Another area would be disturbed feelings or emotions. A fourth major area would be disturbed or abnormal behavior. In my opinion there are prominent symptoms in each of these four areas which are easily evidenced in Mr. Esser.

"*Q*. Would you tell us what conditions are evidenced in Mr. Esser in those particular areas you have spoken of? *A*. I would attempt to illustrate each of these areas and some of the difficulty which he experiences in them. In the matter of his relationship with reality, his poor contact with reality, one of the manifestations is his lack of what would be called empathy. Empathy is the ability to know and to understand, to recognize another person's feelings as if one were that person. Mr. Esser finds marked difficulty in doing that. Mr. Esser for the most part tends to see people much more as objects than he does as human beings and he actually does that in terms of himself as well as other people. This was readily evident in talking to him in his trying to explain

what other people may have felt at different times; and he was quite at a loss to try and do this. He simply is not able to see and to understand the reactions of other people. He tends really to be blank in this kind of way. He tends not to experience, and it is also quite true for himself; this is part of what makes him appear guarded many times, in that he really does not know what kinds of things are going on within himself. As a result of this lack of empathy he tends to distort much of the world around him, the people around him, even the things around him. Another aspect of his poor contact with reality is his tendency to withdraw from people, so that he actually does not get in touch with other people. He cannot communicate readily with them. We have heard some of the other witnesses earlier talk about this very kind of thing in which he simply was unable to convey to them the kinds of things he was thinking and he was feeling or to sense in return the kinds of things that they were trying to tell him. A second major area of difficulty for him is his abnormal thinking. This is perhaps most easily demonstrated in his fantasy life. I talked a little this morning about some of this fantasy life as a child. This kind of fantasy has persisted from probably age thirteen or fourteen on up to the present time. It is still there. The only way in which it has changed and the change he dates to about late 1956, is that his fantasy at this time no longer includes harming people. It includes killing people. His fantasy at this time is not limited as it was earlier to the strangulation of little children, little boys. His fantasy at this time includes killing by a variety of means: Poisoning, drowning, strangulation, shooting, various ways in which he actually kills another person. This kind of fantasy does not center on any one particular person. The tendency still is for it to involve small children but it may be anyone whom he has seen. He may see a child on the street and that might be the object of his fantasy. He may see a child in the courtroom who might be the object of his fantasy. He also states that during the last four years since he has been at central state there has been some tendency for the frequency of his fantasy to be reduced; but even during the last few months in jail he has continued to have some of this fantasy life. When this is present in an adult when it is a means of escaping from the realistic world around him,

then this is an evidence of abnormal thinking. A third major area is in the area of his emotions, his feelings and he demonstrates frequently inappropriate emotional response. He simply lacks the ability to have emotions freely in an unrestricted kind of way. They tend to be shut out. They tend to be eliminated. They tend to be pushed down; so that many of his emotional responses do not conform to those of individuals who are around him. They don't conform to the realistic world around him. They don't necessarily conform to his own ideas. A fourth major area is in terms of irrational behavior. I think the incidents which have been cited involving injury to others is perhaps the easiest way to see this kind of irrational behavior, behavior which for many of you would not be based on the usual kinds of motives that most of us would assume, behavior which results from inner conflict from what we would call his unconscious from the aspects of his personality of which he is not aware and yet the thoughts intrude into his awareness and the behavior results from them without his quite knowing why this has occurred and surely without other people knowing very well why this kind of behavior should result in a given situation. I think these are major ways of trying to explain why I consider that he has a schizophrenic reaction. In terms of the chronic undifferentiated part of it, it is evident, on talking to him, on listening to many other people who have known him and talked to him and going back over many records on reading his letters during the time that he was in military service, on talking with his parents, all of this points to the existence of this kind of condition for many years. It's difficult to name a specific time at which time began; but certainly the emotional disturbance and a diagnosis of a schizophrenic kind of reaction date back many years to make it chronic. The term undifferentiated as I said before, means the symptoms do not fall into one of these four major subgroups of a schizophrenic reaction. He is not predominantly paranoid, catatonic, hebephrenic, or have the manifestations of a simple type of schizophrenic reaction. As a result of this the label which is given is a chronic undifferentiated schizophrenic reaction."

As stated earlier in this opinion, we consider it important to include in the definition of insanity the element of inability to understand the nature and quality of the alleged wrongful act, and the importance of this element seems to us to be illustrated by the testimony just related.

Of course it was for the jury to weigh the testimony of the experts. We do not hold as a matter of law that the record in this case raised a reasonable doubt of sanity. The jury must, however, have believed and given weight to the expert testimony referred to. If given weight, such testimony tends to raise a substantial doubt whether Esser had the capacity to understand the nature and quality of the acts which brought about the death of Jerry Anderson. We conclude that it is improbable that the jury would have returned a different verdict if the court had defined insanity in the manner approved in this opinion.

*By the Court.*—Judgment affirmed.

CURRIE, J. (*dissenting in part*). The underlying reason why society acting through law has adopted the policy of not punishing as a criminal one who, because of mental disease or defect, has committed an act prohibited by the criminal law, is because such person is deemed to have been incapable of exercising any freedom of choice in doing the criminal act. In other words, his mental illness or defect prevented him from exercising any control over the particular act.

The M'Naghten test of insanity, to which the majority opinion adheres, is grounded on the hypothesis that one, even though afflicted with a mental disease or defect, who knows the difference between right and wrong, necessarily possesses the ability to control his actions to conform with this knowledge. While that hypothesis was in accord with psychiatric knowledge back in 1843 when the M'Naghten rule was an-

nounced, it is rejected today by a very substantial number of psychiatrists, probably the majority. The basic hypothesis of those psychiatrists who support the M'Naghten rule is that diseased volition cannot exist apart from diseased cognition.[1] However, not many years ago this question was put to a group of leading psychiatrists: "Are there cases where a person, suffering from mental derangement, knows that it is wrong to inflict bodily harm (killing, maiming, ravishing) upon another person, but owing to the mental derangement is incapable of controlling (resisting) the impulse to commit such bodily harm?" Of the answers received, 93 answered "Yes," only nine answered "No," and six expressed the opinion that no definite answer could be given.[2]

The majority opinion has placed its stamp of approval on Dr. Guttmacher's stated position that a psychiatrist, when testifying in a criminal trial with respect to an accused whom the witness has found is suffering from a mental disorder, should be expected to state, among other things, how the disorder has affected the accused's social behavior and self-control. Yet under the rephrased M'Naghten test of insanity, the jury is in effect told to disregard such testimony and base its findings solely on whether the accused understood the nature and quality of his act, or whether he was capable of distinguishing between right and wrong with respect to such act.

There is something incongruous in a rule of law which takes away from the jury the right of choosing between two conflicting and well-supported medical theories, and requires the jury to base its determination on one and not the other. However, that is exactly what occurs when a Wisconsin jury is instructed under the rephrased M'Naghten rule. This

[1] Hall, General Principles of Criminal Law (2d ed.), p. 524.
[2] Keedy, Irresistible Impulse as a Defense in the Criminal Law, 100 University of Pennsylvania Law Review (1952), 956, 989.

is because under this instruction, if a jury concludes that the accused was capable of distinguishing between right and wrong with respect to the act with which he is charged, the jury must regard as wholly immaterial any evidence that mental abnormality may have rendered him incapable of conforming his conduct to such knowledge.

Had this court adopted the American Law Institute test of insanity, this incongruity would not be present. The A. L. I. test has the advantage of not ruling out a jury determination based on any recognized theory of psychiatry that may have been advanced by expert testimony at the trial. For example, there is nothing in an instruction embodying the A. L. I. test which would prevent a jury from basing its conclusion on expert psychiatric opinion testimony that the accused, although suffering from mental abnormality, was capable of distinguishing between right and wrong with respect to his act, and that as a result he did not lack substantial capacity to conform his conduct to the requirements of law. The jury could reach such a conclusion even though there was present other expert psychiatric opinion testimony that the accused, in spite of being capable of distinguishing between right and wrong with respect to his act, had been rendered incapable by mental disease or defect from conforming his conduct to the requirements of law.

In criminal cases in which a defense of not guilty by reason of insanity has been interposed, the law is concerned with the moral issue of whether the accused had the capacity to exercise a freedom of choice. In resolving this issue, why should not the jury be frankly instructed that an element to be considered is the capacity of the accused to have conformed his conduct to the requirements of law? The charge of the learned trial judge did just that, but the majority holds this was error. This is in marked contrast to the recent enlightened decision of the Eighth circuit court of appeals in

*Dusky v. United States* (1961), 295 Fed. (2d) 743, 759, where the court stated:

"[W]e would be loath, indeed, to reverse where, as here, the trial court has used instructions, whether based theoretically on a M'Naghten variation or on the test set forth in the Modern Penal Code proposed by the American Law Institute or on that form revised as suggested by the third circuit in *Currens* [*United States v. Currens* (3d Cir. 1961), 290 Fed. (2d) 751], or whether couched in still other language *if* the charge appropriately embraces and requires positive findings as to three necessary elements, namely, the defendant's *cognition,* his *volition,* and his *capacity to control* his behavior."

The reason advanced by the majority, as to why the element of the effect of mental abnormality on *capacity to control action* should not be included in the instruction on insanity in criminal cases, that juries might find some accused not guilty by reason of insanity who should be found guilty, leaves me wholly unconvinced. I am unable to bring myself to believe that Wisconsin jurors will fail to exercise the good common sense in this particular type of case that they traditionally have employed in others.

HALLOWS, J. (*dissenting in part*). I reaffirm what I said in the concurring opinion of *Kwosek v. State* (1960), 8 Wis. (2d) 640, 100 N. W. (2d) 339. In the instant case, the trial court gave instructions in terms of free will and this was most important. It does little good to distill and formulate a capsule definition of insanity in several sentences if the standard is not communicated to the jury by meaningful and correct exposition. The jury instructions are the only means by which appellate opinions are translated for the guidance of the triers of the fact.

The problem of formulating a test of insanity in relation to criminal responsibility is admittedly difficult. The major-

ity correctly stated that the test is a legal defense and should be couched in legal terminology rather than in the discipline of psychiatry. The new articulation of the definition of insanity by the majority is a variation of one of the original M'Naghten rules [1] and so far as it goes it is an improvement over the previous statement in Wisconsin. We point out, the uses of the phrase "abnormal condition of the mind, from any cause," although not defined, is an enlargement of the phrase "a defect of reason, from disease of the mind." Abnormal condition of the mind must mean at least an unsound mind or a mental illness and not a character defect. The rule further clarifies the word "know" in the M'Naghten rule by substituting the words "understand" and "distinguish." Thus what has been thought by some scholars to include only conceptual knowledge is broadened to include evaluative knowledge and better describes the cognitive phase of the complex mental process. [2] Certainly, it is true if one is incapable of understanding the nature and quality of his acts, the free will has no basis for a rational choice. Likewise, if one is wholly incapable of distinguishing between right and wrong, a prerequisite condition for the free exercise of the will does not exist. I am not convinced that these are the only indicia which should be used to determine the ultimate fact of whether the act of an individual was his own in the sense he should or should not be held criminally responsible for his act. What we are saying by these words is

[1] *M'Naghten Case* (1843), 10 Clark & F., *200, 8 Eng. Reprint 718.

For a study of the evaluations of the rules and the earlier tests, see Biggs, The Guilty Mind (1955), pp. 79–119.

[2] This change should meet some of the criticism of M'Naghten. See Zilboorg, Misconceptions of Legal Insanity, 9 American Journal of Orthopsychiatry (1939), 540, 552; Werthum, The Show of Violence, p. 86; Hall, Psychiatry and Criminal Responsibility, 65 Yale Law Journal (1956), 761. For a discussion of cases involving interpretations of the word "wrong," see Weihofen, Mental Disorder as a Criminal Defense (1954), pp. 73, 77–80.

that a person did not have the capacity to make a choice or to will or conform or control his conduct. If that is what we mean, why don't we say so in a legal standard?

Most crimes require an intent, *i.e.*, *mens rea* in addition to the act. Unless a person's mental process is capable in a given case of forming such intent, he is deprived of natural choice which the concept of *mens rea* assumes. Underlying the basis of the M'Naghten rule is the concept of the free will or the power in man to make a choice between alternative courses of action. The exercise of the volitional power, which is the end product of the complex mental process, is dependent upon or interrelated with the cognitive phase of the mental process.

I believe that a test of criminal responsibility should include or be stated in terms of the free will of man because it is that concept of the nature of man upon which we have traditionally and morally placed responsibility and is in accord with current-day medical science.[3] The standard of criminal responsibility should be law's expression of society's conception of conduct in terms of the traditional, ethical, and moral standards but stated in terms with real meaning to lay jurors who must apply it to the facts and to judges who must frame the instructions.

I agree that criminal responsibility should not be stated as a test keyed to indefinite and nebulous fact situations or in terms of medical discipline. The law should make use of scientific knowledge, but it need not enter into the field of psychiatry in this instance. The majority opinion does not do so, recognizing the inability to evaluate the conflicting

---

[3] It is true, there is a small minority of psychiatrists who insist upon abandonment of the concept of responsibility based upon free will and moral blameworthiness. These are mostly of the psychoanalytical school of thought. See Alexander and Staub, The Criminal, the Judge, and the Public (1931), pp. 70, 71. See also Freud, General Introduction to Psychoanalysis, pp. 45, 95.

theories underlying psychiatric testimony. I do not have such great doubts of evaluation and cannot accept all theories as having equal value.

Historically, the law has dealt with problems of responsibility with respect to criminal acts, contracts, wills, and certain intentional torts, in terms of capacity to exercise the will or in more-modern parlance, the capacity to control conduct or to regulate behavior and conformity to certain standards. Responsibility in criminal law has been based on the concept of the freedom of the will, the ability of a human being to act or not to act, the power to choose between alternative courses of action. In *Steward Machine Co. v. Davis* (1937), 301 U. S. 548, 590, 57 Sup. Ct. 883, 81 L. Ed. 1279, Mr. Justice CARDOZO said that all law in the western civilization is "guided by a robust common sense which assumes the freedom of the will as a working hypothesis in the solution of problems." In *Gregg Cartage & Storage Co. v. United States* (1942), 316 U. S. 74, 79, 62 Sup. Ct. 932, 86 L. Ed. 1283, we find Mr. Justice JACKSON stating:

"How far one by an exercise of free will may determine his general destiny or his course in a particular matter and how far he is the toy of circumstance has been debated through the ages by theologians, philosophers, and scientists. Whatever doubts they have entertained as to the matter, the practical business of government and administration of the law is obliged to proceed on more or less rough and ready judgments based on the assumption that mature and rational persons are in control of their own conduct."

Judge ARNOLD in *Fisher v. United States* (App. D. C. 1945), 149 Fed. (2d) 28, 29, stated:

"In the determination of guilt, age-old conceptions of individual moral responsibility cannot be abandoned without creating a laxity of enforcement that undermines the whole administration of criminal law."

A most-vigorous plea for stating the rule of insanity in terms of free will is made by Judge BERGER in his separate opinion in *Blocker v. United States* (D. C. Cir. 1961), 288 Fed. (2d) 853.[4]

I suspect the failure to state a standard of criminal responsibility in the primary language of the freedom of the will is due to several causes: (1) Disbelief in the existence of the freedom of the will, (2) the difficulty of stating such a rule, (3) the fear of accepting the theory of irresistible impulse, and (4) the refusal by some forensic psychiatrists to translate or key their testimony to such a standard because under their theory of dynamic psychiatry, there is either no freedom of the will or it plays a very subordinated role in human conduct. We are cautioned, "The law should not accept the apodictic statements of some extremists as representative of all psychiatric thought." Cavanagh, Fundamental Psychiatry, p. 576. To these reasons we must include the additional ones stated in the majority opinion: (1) That the variations of the M'Naghten rule have worked satisfactorily, (2) that any restatement expressly including or recognizing the "free will" would possibly enlarge the number of defendants who would escape the social ostracism of being found guilty, and (3) in Wisconsin, it does not make much difference if a person is found guilty and he is insane because he will be transferred to a hospital for criminally insane. Even in this, the majority is not united because the author of the opinion expressed a personal preference for a more-liberal rule if the burden of affirmatively proving the plea of insanity were on the accused.

We have no quarrel with placing the burden of proof of meeting any standard of insanity upon the defendant. Such defense, which must be pleaded specially, could well be con-

---

[4] See also Keedy, Irresistible Impulse as a Defense in the Criminal Law, 100 University of Pennsylvania Law Review (1952), 956, 986.

sidered an affirmative one which ought to be proven by the preponderance of the evidence as in civil cases because a finding of not guilty because of insanity as a practical matter results in an automatic commitment under the statutes to a mental institution. This view was taken in *United States v. Naples* (D. C. Cir. 1961), 192 Fed. Supp. 23. It is somewhat of an incongruous result under our present law when a person is committed to a mental institution not on an affirmative finding of insanity but on an essentially negative one that the jury had a "reasonable doubt of his sanity or mental responsibility." Sec. 957.11, Stats. In civil cases, such a finding would not sustain a commitment. Secs. 51.03 and 51.05. However, wherever the burden of proof is placed by the legislature, it has no logical relationship to the problem of correctly stating the test of insanity unless the court is attempting to control the end result in criminal cases by tailoring the means to attain that purpose.

Perhaps the two most-serious objections to stating the rule in basic terms of freedom of the will are the disbelief in that concept or the fear of those who recognize such a belief that the doctrine of irresistible impulse will take over the field of criminal insanity as a defense. Professor Wilber G. Katz, from a behavioristic standpoint and not admitting the existence of the freedom of the will, suggests a possible understanding between the psychoanalytical school of psychiatry and the law by both recognizing the concept of free will "as if" it existed in man. Katz, Law, Psychiatry, and Free Will, 22 University of Chicago Law Review ·(1955), 397. John R. Cavanagh, a noted psychiatrist, recognizing the existence of the freedom of the will, believes the "irresistible-impulse test" is misnamed and misunderstood and advocates the renaming and retention of the test as the "unresisted-urge test." In his view, the individual is considered not responsible when, even if he knows what is right, he is unable by reason of mental illness to adhere to this judgment and this

concept, properly understood, preserves the principle of the freedom of the will.

The great difficulty in solving this problem or of even understanding various phases of it is a matter of semantics. For an exhaustive review and evaluation of the subject, and bibliography, see Lindman and McIntyre, The Mentally Disabled and the Law (1961), pp. 330–372. Psychiatrists do not agree among themselves on their own terminology.[5] Neither do they agree on the basic theory of their psychiatry, and consequently the same clinical facts give rise to diametrically opposed interpretations. Likewise, in legal literature, the terms of any definitions or any rule connote different meanings to various judges, law professors, and lawyers. Underlying these various concepts are fundamental differences in the purpose of punishment and the function of the criminal law, differences in philosophical thought, and differences in theories of psychiatry and especially of the nature of man, his personality, and his mental process.

Some defenders of the various variations of the M'Naghten rule deny the existence or the possibility of an irresistible impulse. If by "irresistible impulse" is meant that there is no power in man to choose and that all human action is determined in a behavioristic or mechanical way, I would repudiate the theory because that concept of irresistible impulse forecloses and denies even the possible existence of a free will. If by "irresistible impulse" is meant exaggerated, uncontrolled passions, emotions, or urges, I would likewise not accept the existence of such an "irresistible impulse" because such emotions and passions and urges are to a large extent controllable by the will. In such cases where the will has not been developed and strengthened by exercise, such urges are most influential but not determinative of the

---

[5] Hakeem, A Critique of the Psychiatric Approach to Crime and Correction, 23 Law and Contemporary Problems (1958), 650, published by Duke University School of Law.

action; and if determinative, criminal responsibility should still attach. To my mind, this class of cases, regardless of what label is put on them by a psychiatrist, is not an abnormal condition of the mind but a defect of character or personality. A person cannot be indisposed to develop his personality in accordance with his nature as a human being and the demands of society and then claim he is not responsible for his acts. Such state of personality did not arise out of a blameless condition of the mind, whether we call it a defect of reason, an abnormal condition, or a mental illness, but originated in a voluntary disposition. For cases involving irresistible impulse, see Annos. 70 A. L. R. 659, and 173 A. L. R. 391.

One can recognize free will and not accept the irresistible-impulse theory. The will always acts consciously in making a choice. This is not to say the will is not influenced by the unconscious forces and perhaps by not understandable urges, passions, and emotions, but the will is not inexorably determined or coerced by them. Many of our actions are not voluntary and not acts of the free will. Only those acts which follow and are based upon deliberation can be free. The will can only act upon what appears to it as good, a subjective presentation by the intellect which may or may not have a basis in reality.

The disputed question of criminal culpability, however, remains in those cases where the so-called irresistible impulse, or, as sometimes stated, an unresisted urge, has developed so excessively because of mental illness at the expense of the other psychic powers that in comparison to this urge or impulse, the other powers exert negligible influence upon reason when it is called upon to make a judgment. The impulse, occupying as it does not the subconscious but the central point of consciousness, becomes the basis upon which the intellect represents the course of conduct as desirable to the will. If such a mental condition is the result

of mental illness and not of a blameworthy defect of personality, ought the accused be held criminally responsible?

The lack of capital punishment in Wisconsin and the state's policy in respect to sex crimes have little justification in stating legal insanity in terms of M'Naghten. One solution open to those who are unsure of the correct solution to the problem or who attempt to reconcile what is irreconcilable is to espouse the suggestion that the accused who pleads insanity should be tried first on the basis of whether or not he committed the antisocial act without reference to any legal test of insanity, then after an affirmative finding, to determine his insanity or lack of it in a medical sense and make such disposition as the facts warrant. See the concurring opinion of Mr. Chief Justice WEINTRAUB, in *State v. Lucas* (1959), 30 N. J. 37, 83, 152 Atl. (2d) 50, 75.

Our second main objection to the majority opinion is the reaffirmance of certain language in *State v. Carlson* (1958), 5 Wis. (2d) 595, 93 N. W. (2d) 354. It has traditionally been the practice to apply the same test of materiality of evidence in criminal cases as in civil cases and to require expert medical opinions to be given to a medical certainty. We have also required the acceptance and validation of various tests by the medical profession. It seems to me the majority has done away with these requirements in allowing into evidence any and all medical testimony on the nebulous catchall phrase of giving the jury a picture of the whole man. Under this concept, all medical evidence is material. A great deal of medical testimony which has no relevancy or materiality to the act charged will be let in and the trial will become a battle of the experts over conflicting psychiatric theories and interpretations. When the jury has been sufficiently confused, the trial court under our present procedure will then attempt to narrow the legal issues in its instructions on the M'Naghten rule. I venture to say that these instruc-

tions, whatever they may be, will come too late to be of much help or guide to the jury.

Threading its way through the majority opinion is a vague concept that criminal responsibility in each case ought to be determined by the jury's vague sense of contemporary social justice. This concept is that justice should be egocentric rather than public-centric. This idea is disavowed, but the result is reached under the application of the majority rule tied as it is with the unlimited admissibility of evidence. For practical purposes, we reached the result enunciated in *Durham v. United States* (D. C. Cir. 1954), 214 Fed. (2d) 862, and the unaccepted recommendation of the British Royal Commission on capital punishment—a standardless standard of whether the accused ought to be held responsible. Instructions under the majority rule or any standard come too late to counteract effectively the image created in a jury if any psychiatrist can give any and all information on the accused's mental condition, whether such testimony has anything to do with the act or not. The burden is placed upon the jury to exclude the immaterial evidence after it has heard it rather than upon the court.

The justification for this result cannot be grounded as it is by the majority on the basis of the criticism by some psychiatrists who assert they cannot testify in terms of impairment of the capacity to distinguish right from wrong, or to key or translate their testimony or evaluations to any legal test. Nor do we believe justification can be predicated on the statement that the jury will be best able to perform its function if given all the information qualified experts are able to give even if such information does not fit nicely into the definition. Coupled with this reason is the belief or fear of the majority of the probability that no general standard can be devised which would satisfactorily fit all cases.

I believe the approach to the problem of adopting a limited legal definition of insanity and practically disregarding it

by allowing in all evidence of what might be called medical insanity or mental illness is wrong and will not fulfil the purpose of society or the function of criminal law. The proper method is to formulate a more-fundamental definition of legal insanity and restrict medical testimony to what is material to that standard. Because of the doubts expressed in the majority opinion and the apparent lack of unanimity in all its phases, I suspect the problem remains with us. When it is again re-examined, the rule of insanity should be stated expressly in terms of the freedom of the will with appropriate instructions and explanations given in the opinion and the scope of medical testimony reasonably restricted to what is material to that issue.

DIETERICH, J. (*dissenting in part*). I agree with the majority of this court that no evidence should be excluded which reasonably tends to show the mental condition of the defendant at the time of the offense. The majority does not however, liberalize the M'Naghten rule sufficiently to allow instruction to the jury which would permit the jury to use the full range of evidence before it. This incongruity could, in large measure, be eliminated by the addition to the M'Naghten rule, as modified, an additional clause incorporating the irresistible-impulse test.[1] The rule as thus broadened would be more consistent with the admission of all relevant evidence of the defendant's mental condition at the time of the offense and would require instructions to the jury consistent with the evidence before it.

---

[1] I would suggest the following modification of the M'Naghten rule: The term insanity in the law means such an abnormal condition of the mind, from any cause, as to render the defendant (1) incapable of understanding the nature and quality of the alleged wrongful act, or (2) incapable of distinguishing between right and wrong with respect to such act, or (3) incapable of preventing himself from committing the wrongful act.

See *State v. White* (1954), 58 N. M. 324, 270 Pac. (2d) 727.